| | | |
|---|---|---|
| PATRICIA HICKS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 15 C 06852 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CITY OF CHICAGO, et al. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In the early morning hours of July 2, 2015, plaintiff Patricia Hicks allegedly woke to a call from her daughter, Jasmin, from the backseat of a police car. R. 71, Third Am. Compl. ¶¶ 24-25.[1] That call, according to Hicks, was a plea for help: police officers were telling Jasmin that she either had to come up with a gun to give the officers or else face being charged with a crime she did not commit. *Id.* ¶¶ 26-27. Under that threat, Hicks set out in search of a gun to free her daughter, allegedly spending $1,000 on firearms that she traded for Jasmin's release. *Id.* ¶ 52. She now brings suit against the Cook County Sheriff's Office, Officers Murphy, Mousel, Dwyer, Doyle, Mears, O'Malley, and Gosling, as well as the Village of Lynwood, alleging 13 counts: a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 (Count 1); illegal search and seizure under 42 U.S.C. § 1983 (Counts 2 and 3); § 1983 claims for failure to intervene and for civil conspiracy (Counts 4 and 5); an equal protection claim (Count 6); procedural

---

[1]Citations to the record are noted as "R." followed by the docket number and, where necessary, the page or paragraph number.

and substantive due process claims (Counts 10 and 11); a § 1983 claim against Officers O'Malley and Dwyer predicated on supervisor liability (Count 12); *Monell* claims against the Cook County Sheriff's Office and the Village of Lynwood (Counts 7 and 13); and a state-law claim for intentional infliction of emotional distress (Count 9).[2] Between three separate (and sometimes overlapping) motions to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), Defendants collectively seek to dismiss Hicks's entire third amended complaint.[3] For the reasons discussed below, the motions to dismiss are granted in part and denied in part.

## I. Background

For purposes of this motion, the Court accepts as true the allegations in the Third Amended Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Patricia Hicks was contacted by her daughter, Jasmin, in the early morning hours of July 2, 2015. Third Am. Compl. ¶ 24. Jasmin and her boyfriend had been pulled over in a traffic stop. *Id.* ¶¶ 15-16. The boyfriend did not have a valid license and Jasmin was on probation. *Id.* ¶¶ 16, 18.[4] According to Hicks, what she learned from the call with Jasmin[5] was that the police were demanding guns in exchange for Jasmin's

---

[2] Hicks also includes a claim for indemnification against the Cook County Sheriff's Office and the Village of Lynwood (Count 8).

[3] Defendants Cook County Sheriff's Office, Officer Murphy, Officer Mousel, Officer Dwyer, Officer Doyle, Officer O'Malley, and Officer Gosling jointly filed a motion to dismiss the entirety of the third amended complaint, R. 81, Defs'. Mot. to Dismiss. Officer Mears separately filed his own motion to dismiss against Counts One, Six, and Eleven, R. 76, Mears' Mot. to Dismiss. The Village of Lynwood moved to dismiss the *Monell* claim against it (Count 13), R. 77, Lynwood Mot. to Dismiss.

[4] According to the complaint, the boyfriend was released without charges. Third Am. Compl. ¶¶ 20, 23.

[5] From the complaint it is unclear whether initially Hicks spoke on the phone with an officer. Hicks alleges that "the police did not speak with Plaintiff at that time," Third Am. Compl. ¶ 25, but says immediately in the next paragraph that "[l]aw enforcement

freedom. *Id.* ¶¶ 25-27. The officers were threatening to falsely charge Jasmin with a crime unless someone (either Jasmin or the boyfriend or Hicks) turned over guns to them. *Id.* ¶¶ 17, 26. Hicks did not have any guns to give. *Id.* ¶ 28. The complaint does not say whether Hicks told this to her daughter or to the officers directly (or to neither), but according to Hicks, Officers Doyle and Mears then came to Hicks's house and searched through the contacts on her phone. *Id.* ¶ 31.

Doyle and Mears next allegedly took Hicks with them in their car, under threat of detaining Jasmin further, to force Hicks to go buy a gun near the intersection of 75th Street and Martin Luther King Drive in Chicago. *Id.* ¶¶ 32-25. This gun run was unsuccessful. The officers then dropped off Hicks back at her house, and kept Jasmin in custody. *Id.* ¶ 37. The officers (presumably still Doyle and Mears) told Hicks she had one more day to come up with a gun to trade for Jasmin's release, and reiterated the threat of bringing false charges against Jasmin. *Id.* ¶¶ 39-40.

Later that day (still July 2), Hicks allegedly texted with Officer Murphy to arrange a trade of guns for Jasmin's release. *Id.* ¶¶ 42-51; *see also* R. 71 Exh. 1, Text Messages at 1-8. Murphy was now demanding three guns in order to hand over Jasmin, texting "The deal was 2 for your daughter and 1 for the car the one last night was just to get her out right then." Third Am. Compl. ¶ 45; Text Messages at 2-3. He added, "I will be out [toward Hicks's area] around 330, u need to have those items so I can release Jasmin." Third Am. Compl. ¶ 47; Text Messages at 3.

---

officers assured Plaintiff that the submission of a firearm would trigger the release of her daughter," *id.* ¶ 26.

Hicks alleges that she spent $1000 on two guns to give the officers. Third Am. Compl. ¶ 52. She placed them in a bag behind a trashcan at 6853 S. Prairie Avenue in Chicago. *Id.* ¶ 53. Officers Murphy and Gosling arrived in a black unmarked police car. *Id.* ¶ 54.[6] After retrieving the bag and checking it, they then released Jasmin and gave her a copy of her license. *Id.* ¶¶ 55-59.[7]

Five days after that handoff, on July 7, Officer Murphy (or someone using the same cell phone number that Murphy had used five days earlier) allegedly contacted Hicks again, demanding a third gun. Third Am. Compl. ¶ 63. Hicks and Murphy negotiated, via texts, another drop-off. Text Messages at 8-11. Hicks texted Murphy: "You promised me after I give you this God [sic] we don't owe you anything else. U is finished with us you have no reason to contact us no more." Third Am. Compl. ¶ 65; Text Messages at 10. Murphy replied, "Absolutely, this is it." Third Am. Compl. ¶ 66; Text Messages at 11.

When Officer Murphy arrived to pick up the third gun, he was confronted by Hicks's attorney. Third Am. Compl. ¶¶ 67-68; R. 71 Exh. 4, July 7 Video 1; R. 71 Exh. 5, July 7 Video 2; R. 88, Pl.'s Combined Resp. Br. at 4.[8] The "confrontation" is not elaborated upon in the complaint but two video exhibits, referenced in the complaint, allegedly document the interaction. Third Am. Compl. ¶ 68; July 7 Video 1; July 7 Video 2. In one of those videos, attorney Jared Kosoglad speaks with

---

[6] Although the complaint does not specify that Jasmin was in the car with them, it can be inferred based on what is described a few paragraphs later. Third Am. Compl. ¶ 59 ("Satisfied that payment had been made to secure the release of Plaintiff's daughter, the defendants then released Plaintiff's daughter…").

[7] Hicks also submitted two video exhibits allegedly documenting this exchange. R. 71 Exh. 2, July 3 Video 1; R. 71 Exh. 3, July 3 Video 2.

[8] The complaint does not state that the confrontation is with Hicks's attorney.

Officer Murphy. July 7 Video 2. Kosoglad asks the officer, among other things, "what are you doing here?", to which the officer replies, "I'm here because they asked me to come over" and that "they dropped something for me." *Id.* After a few more exchanges,[9] the officer walks away to a car and drives off. *Id.*

Hicks alleges that she then tried to file complaints with the Cook County Sheriff's Office. Third Am. Compl. ¶¶ 71-78. Specifically, on July 8, 2015, she went to the Sheriff's Office headquarters to file a complaint against Officer Murphy. *Id.* ¶ 70. She was interviewed by Michael Goldsmith, who was supposedly an "inspector," but was told that he did not have authority to open an investigation into her complaint and that because there was no notary on hand, paperwork could not be started to file a complaint with the Office of Professional Review. *Id.* ¶ 71. Hicks alleges that Goldsmith then took her information and shared it so that the officers could create a cover-up story for the incidents described above. *Id.* ¶¶ 71-76. Between July 10 and July 12, Officers Gosling, Murphy, Dwyer, Doyle, and Mousel created reports with "numerous false assertions," according to the complaint. *Id.* ¶¶ 76, 78.

Based on these allegations, Hicks brought thirteen claims against the various Defendants in her Third Amended Complaint. In Count One, Hicks contends that

---

[9] Upon further probing the officer says that he does not need to answer Kosoglad's questions. July 7 Video 2. When Kosoglad asked whether the officer "pick[ed] up Jasmin a couple days ago," the officer replies, "that's a legal matter between me and them." *Id.* Kosoglad then asserts that he is "their attorney" and asks for further information about what happened with Jasmin: "… what's the deal? You picked her up? You took her around? They gave you a couple guns? What happened?" *Id.* To which the officer responds: "they told you whatever they needed to tell you, right?" and repeatedly says "you can talk to them about that." *Id.* Kosoglad then asks to know the name of the officer's supervisor as the officer gets in a car and drives away. *Id.*

all of the named officers were participants in a racketeering enterprise (namely, the Cook County Sheriff's Office),[10] conspiring to extort firearms from civilians by means of violence, threats, and other means of influence. Third Am. Compl. ¶¶ 87-92. She further pleads that officers unconstitutionally searched and seized her, and at the same time other officers failed to intervene (Counts Two through Four), *id.* ¶¶ 93-109; officers conspired to violate her constitutional rights (Count Five), *id.* ¶¶ 110-117; officers deprived of the equal protection of the law, as well as procedural and substantive due process (Counts Six, Ten, and Eleven) ¶¶ 118-123, 146-155); and officers committed intentional infliction of emotional distress (Count Nine), *id.* ¶¶ 141-145. In addition, she brings *Monell* claims against the Cook County Sheriff's Office and the Village of Lynwood for failure to train, supervise, or discipline officers under their responsibility (Counts Seven and Thirteen). *Id.* ¶¶ 124-137, 161-171.

Defendants now move to dismiss all of these claims for failure to state a claim, as well as for lack of jurisdiction with respect to the RICO claim. *See* Defs'. Mot. to Dismiss; Mears' Mot. to Dismiss; Lynwood Mot. to Dismiss; R. 91, Defs'. Reply Br.; R. 96, Mears' Reply Br.; R. 89, Lynwood Reply Br.

## II. Standards of Review

Defendants move to dismiss the complaint for failure to state a claim. Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to

---

[10] Hicks alleges that, for the purposes of the RICO claim, the "enterprise" is the "Cook County Sheriff's Department" (or the "Cook County Sheriff's Office") itself. *See*, *e.g.*, Third Am. Compl. ¶¶ 88, 89, 91.

relief." Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (internal quotation marks and citation omitted). These allegations "must be enough to raise a right to relief above the speculative level," *id.*, and must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The allegations entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

In assessing a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) motion, the plaintiff bears the burden of establishing jurisdiction. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588–89 (7th Cir. 2014). If the challenge to jurisdiction is based on the allegations in the complaint, then "the district court must accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). "[A] factual challenge lies where the complaint is formally sufficient but the contention is that there is in fact no subject matter jurisdiction. … [W]hen considering a motion that launches a factual attack against jurisdiction, the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digital, Inc. v.*

*Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (internal quotation marks omitted).

### III. Analysis

### A. RICO (Count One)

Count One alleges that all of the individual officers named in the Complaint took part in a "racketeering enterprise" in violation of RICO, 18 U.S.C. §§ 1961-1968. Third Am. Compl. ¶¶ 87-92. According to Hicks, "sheriff's deputies used their official positions to illegally commit a pattern of racketeering activity, including … kidnapping, extortion, robbery, obstruction of justice, intimidation of witnesses, [and] retaliation of witnesses," among other activities. *Id.* ¶ 88.

Hicks alleges an Office-wide scheme in which "[o]fficers threaten civilians with the lawful and unlawful use of their official authority in order to obtain firearms." *Id.* ¶ 8. As part of the enterprise, Officers Murphy, Mousel, Dwyer, Doyle, Mears, O'Malley, and Gosling allegedly agreed, with the blessing of the Cook County Sheriff's Office, to get firearms through threats or force and then to not file reports on the incidents. *Id.* ¶ 11. According to Hicks, the Sheriff's Office has a "widespread practice of perjury, false arrests, false report making, and bringing of false charges" to "cover up … unlawful conduct," and that it effectively maintains a "code of silence" with respect to police wrongdoing. *Id.* ¶ 74. In response, the officers contend that Hicks's RICO claim should be dismissed because: (1) Hicks lacks standing to bring the claim; and (2) Hicks fails to state a RICO claim even if she has standing. Defs'. Mot. to Dismiss at 5-12; Mears Mot. to Dismiss at 4-10.

Among other things, RICO prohibits "any person employed by or associated with any enterprise" from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).[11] A "pattern of racketeering activity" is defined by the statute as requiring "at least two acts of racketeering activity,"[12] and eligible acts run the gamut from murder and kidnapping, to bribery and extortion, to fraud, to obstructing justice, and so on.[13] Anyone "injured in his business or property" may bring a RICO suit in a federal district court and, if successful, a plaintiff is entitled to recover "threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

As explained in a moment, Hicks does not sufficiently allege a *pattern* of racketeering activity that is connected to the alleged *enterprise*—the Cook County Sheriff's Office—so her RICO claim must fail. But it is worth noting that Hicks does appear to have adequately alleged predicate acts of kidnapping and extortion, and also properly alleged an injury to her property. According to Hicks, officers threatened, under color of official right, to bring false charges against her daughter, which would result in her daughter's continued detention. Under this threat, the officers transported Hicks to go buy guns. And she had to buy guns, using $1,000 of

---

[11] For the purposes of RICO, "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

[12] There are other requirements on when the acts must have taken place, but they are not relevant here: for example, "pattern of racketeering activity" "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

[13] See 18 U.S.C. § 1961(1) for the complete list.

her own money, in order to ultimately defuse the threat and get her daughter back. So even setting aside whether the money spent by Hicks for attorney fees is a RICO injury here, the officers in effect extorted at least $1,000 from Hicks for the release of Jasmin.[14]

The problem for the RICO claim is that Hicks has not adequately alleged that the officers conducted (or participated in the conduct of) the enterprise's affairs through a pattern of racketeering activity. Remember that Hicks alleges that the enterprise is the Cook County Sheriff's Office, Third Am. Compl. ¶ 91, and the pattern alleged includes (but is not limited to) "kidnapping, extortion, robbery, obstruction of justice, intimidation of witnesses, retaliation against witnesses, interference with commerce by threats and violence, influencing, delaying, and preventing testimony, and hindering, delaying, and preventing the communication of federal offenses to law enforcement agencies and judicial officers …" *Id.* ¶ 88. Ostensibly in support of the RICO claim (as well as the various conspiracy claims), Hicks lists other allegations of Cook County Sheriff's Office misconduct: Cook County deputies stopped six other persons, extorted a gun or other contraband from them, and then did not file reports on the stops. *Id.* ¶ 81.

---

[14] Because the $1,000 used to buy the guns satisfies the injury-to-property element, there is no need to opine on whether the injury element is an Article III standing issue or a RICO-merits issue. *See* Defs'. Mot. to Dismiss at 6-7. Defendants further argue that the $1,000 expenditure is not a RICO injury because even a concrete financial loss must be linked directly to the alleged wrongdoing. *Id.* at 7-8. But taking Hicks's factual assertions as true for the time being, there is a direct relationship between the money Hicks spent and the alleged misconduct of the Defendants. The officers demanded guns from her in order to release her daughter, and Hicks complied by spending money to buy them.

These six other incidents, however, do not (as currently drafted) cohere with what happened to Hicks. There is a broad brush allegation about the threat of false charges, Third Am. Compl. ¶ 81, but then in only one of the incidents does Hicks assert that false charges were threatened or weapons demanded (and in that incident no specific officer is identified). *Id.* ¶ 81(E). And only one of the other supplemental incidents specifically alleges that officers retrieved a gun (and there Hicks does not specifically allege that the victim of that incident was facing false charges). *Id.* ¶ 81(F). The listing of the six incidents does not contain enough factual detail—as distinct from broad conclusions—to connect the alleged pattern of racketeering activity to the enterprise.

Indeed, remember that the alleged enterprise is the Cook County Sheriff's Office *itself*. Third Am. Compl. ¶ 91. That is a sprawling allegation. Rather than target a set of officers as an association-in-fact enterprise, Hicks goes after the Office itself, which means that for such an expansive racketeering allegation to be plausible, more than six other scattershot incidents—taking place from 2010 to 2016—is necessary. Consider how many hundreds (and probably thousands) of interactions take place between deputies and civilians in any one year, and extrapolate that over the time period of 2010 through 2016. To be sure, there is no need for the entirety of an enterprise to be corrupt in order to plead a RICO claim, but it cannot be said that a total of seven incidents out of thousands in around six years amounts to conducting the affairs of the Sheriff's Office through a pattern of racketeering activity. It is one thing for a plaintiff to start with a narrower set of

associated-in-fact officers and then expand the alleged enterprise based on what turns up in discovery. But it is quite another for Hicks to start with the Office as the enterprise with just the limited set of allegations in the complaint. The RICO claim is dismissed.

## B. Unreasonable Seizure (Count Two)

Moving on to the Fourth Amendment claim for an unconstitutional seizure, the Court concludes that Hicks has plausibly pled that claim. The Fourth Amendment (applicable to the state and local governments through the Fourteenth Amendment's due process clause) prohibits unreasonable seizures. U.S. Const. amend. IV. Hicks must plausibly plead and eventually show both that she was seized and that the seizure was unreasonable. Someone is seized "only if, in view of all of the circumstances surrounding the incident, a reasonable person [in Hicks's position] would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). For encounters where someone is either in their own home or restricted in some other way, the more relevant question is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991) ; *see also White v. City of Markham*, 310 F.3d 989, 994 (7th Cir. 2002). In analyzing whether someone has been seized, courts look at a variety of factors, including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."

*Mendenhall*, 446 U.S. at 554; *see also White*, 310 F.3d at 994. To qualify as a seizure, "the subject [must] actually yield to a show of authority from the police or be physically touched by the police." *Tom v. Voida*, 963 F.2d 952, 957 (7th Cir. 1992).

Taking the complaint's allegations as true, Hicks was not free to leave in any reasonable sense. Defendants argue that Hicks has not alleged that any officer "verbally threatened or intimidated her" or that she yielded to a "show of authority" from the police. Defs'. Mot. to Dismiss at 13. But according to Hicks, she was not free to refuse the officers' demands for guns if she wanted to prevent her daughter from being charged with a false crime and possibly being detained longer. Sure, it was not Hicks *personally* who was targeted for the false charge, but it is at least plausible to conclude that a reasonable person would not feel free to terminate her interaction with the officers. And Hicks does allege that she herself, under the officers' threats, was transported away from her home (to go buy the guns) by Defendants without "valid consent." Third Am. Compl. ¶¶ 32-33; *see also* Pl.'s Resp. Br. at 3 ("Agent Doyle of the CCSO[15] and Mears of Lynwood transported Plaintiff … to purchase a firearm for the CCSO and officers *against her will*, under threat of retaliatory charges against her daughter for failure to cooperate.") (emphasis added).[16] The fact that officers allegedly already had Jasmin in their custody lends

---

[15] "CCSO" is an acronym for Cook County Sheriff's Office.

[16] Defendants unpersuasively contend that no officer ever communicated to Hicks "any kind of specific or direct threat that her daughter would have false charges brought against her or would go to jail if illegal firearms weren't submitted to the Defendants." Defs'. Reply Br. at 9. Hicks alleges that the officers threatened to hold Jasmin until Hicks

further credence to the idea that the officers would make good on their threat unless Hicks complied.[17] The pressures instilled by the officers are plausible enough reason for Hicks to get in the officers' car against her will. There are more than enough allegations to satisfy the requirement that police made a "show of authority" and that Hicks yielded to it by leaving her house and getting in a car with the officers.

The second element of the claim—reasonableness of the seizure—is not disputed. All of Defendants' arguments on the seizure claim are in service of denying that Hicks's car-ride with the officers qualifies as a seizure. Defs'. Mot. to Dismiss at 12-13; Defs'. Reply Br. at 8-9. That is not surprising, because, as alleged, the unreasonableness of the seizure is obvious. In going to Hicks's home and taking her on a ride to buy illegal guns, the officers were not promoting any legitimate governmental interest. With the two elements of the seizure claim properly pled, Defendants' motion to dismiss Count Two is denied.

### C. Unreasonable Search (Count Three)

Next, Hicks alleges that officers engaged in an unreasonable search. This claim too survives, at the very least as to the search of the contents of her phone. The Fourth Amendment disallows unreasonable searches of one's "persons, houses, papers, and effects." U.S. Const. amend. IV. Except under some narrow circumstances, searches are unreasonable without a warrant or consent. *United*

---

could produce weapons, and that allegation is plausibly supported by the text messages documented in the exhibits.

[17] The question of how unlawful threats to arrest family members should be analyzed arises more often in the context of confessions. *See*, *e.g.*, *United States v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993) ("Coercion may involve psychological threats as well as physical threats. Specifically, threats to arrest members of a suspect's family may cause a confession to be involuntary.") (citing *Rogers v. Richmond*, 365 U.S. 534 (1961)).

*States v. Richards*, 741 F.3d 843, 847 (7th Cir. 2014) ("warrantless searches or arrests are constitutionally permissible when a 'narrowly proscribed' exception exists.") Searches done without warrant or consent inside one's home are presumptively unreasonable. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.") (internal quotation marks omitted).

Here, Hicks alleges that officers came to her home and "searched through the contacts on her phone without any lawful basis" Third Am. Compl. ¶ 31. It is true that, as Defendants argue, some additional details would make this claim much clearer: did this phone search happen *inside* the house? If so, how did the officers get in? Did Hicks initially refuse to give over her phone? *See* Defs'. Mot. to Dismiss at 16-17.

Regardless of the answers to these questions, Hicks has pled enough at this stage for the unconstitutional search claim to go forward, at least as to the search of her phone. In light of the threatening circumstances, as discussed earlier, even if Hicks "consented" to giving her phone to the officers, that consent was not valid because of the threats to Jasmin. "Consent searches are valid only if the consent was freely and voluntarily given. … The question of whether a consent was voluntary, as opposed to the product of duress or coercion, is a question of fact to be determined from the totality of all the circumstances." *United States v. Duran*, 957 F.2d 499, 502 (7th Cir. 1992) (internal quotation marks omitted). The complaint's

allegations plausibly assert that the so-called consent here was the product of coercion.

If there was no valid consent, then there is not much question that the complaint adequately alleges that the search was unreasonable. Defendants argue that the search was "minimally invasive" and that searching cell phones has been allowed in this Circuit. Defs'. Mot. to Dismiss at 17 (citing *United States v. Florez-Lopez*, 670 F.3d 803, 807 (7th Cir. 2012) ("If [police are] allowed to leaf through a pocket address book, as they are, they should be entitled to read the address book in a cell phone.")) But that argument is misplaced, because those searches arose in the context of searching a phone incident to an arrest. More importantly, that line of cases is no longer good law: absent exigent circumstances or consent, officers must obtain a search warrant to search a smartphone. *Riley v. California*, 134 S. Ct. 2473, 2493 (2014). This claim survives, at least as to the search of the phone, and the parties should make clearer through conferral and interrogatories whether Hicks is also alleging an additional unreasonable entry into, or search of, her home.

### D. Failure to Intervene (Count Four)

Hicks's failure to intervene claim likewise survives, as it is predicated on her unreasonable-seizure claim. Third Am. Compl. ¶¶106-107. "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been

committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (emphasis in original). As discussed earlier, Hicks has successfully alleged that she was unreasonably seized. And in light of the nature of the allegations—that officers worked together to extort guns from Hicks in order to free Jasmin and prevent the filing of false charges—it is plausible that all of the named individual officers could be held liable, because it takes a joint effort to carry out the alleged extortion. But during discovery, and certainly at the summary judgment stage when the test is not mere plausibility, Hicks must consider whether to drop the failure to intervene claim as to certain officers if there is no evidence that they could have intervened against the seizure (for example, an officer who did not join in on the misconduct until after the seizure happened). For now, the failure to intervene claim survives.

### E. Section 1983 Conspiracy (Count Five)

Conspiracy does not provide an independent basis of liability under § 1983. *See Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008). In other words, there is no such thing as a stand-alone claim for "conspiracy"—there must be an underlying constitutional violation. *Id.* "For liability under § 1983 to attach to a conspiracy claim, defendants must conspire to deny plaintiffs their constitutional rights," as "there is no constitutional violation in conspiring to cover up an action which does not itself violate the constitution." *Hill v. Shobe*, 93 F.3d 418, 422 (7th Cir. 1996); *see also Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000)

(noting that "[t]he jury's conclusion that [the plaintiff] suffered no constitutional injury ... foreclose[d] relief on the [plaintiff's § 1983] conspiracy claim"). To the extent that Hicks is alleging conspiracy as a stand-alone claim, it is dismissed. To the extent that Hicks seeks to hold individual officers as liable for constitutional violations based on a conspiracy theory of liability, that theory can be addressed at the summary judgment stage (and throughout discovery, because it might become clear that certain defendants cannot be deemed co-conspirators).

### F. Equal Protection (Count Six)

Next up is the equal protection claim. For a race discrimination claim, like Hicks's, an equal protection claim must allege *intentional* racial discrimination. *Barnett v. Daley*, 32 F.3d 1196, 1198 (7th Cir. 1994). The plaintiff must plead facts making the inference plausible that relevant "decisionmakers ... acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987); *Chavez v. Illinois State Police*, 251 F.3d 612, 645 (7th Cir. 2001); *Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 1996). Here, Hicks alleges that "[t]he actions of seizing Plaintiff and subjecting her daughter to unwarranted criminal prosecutions unless she provided them with a weapon were the result of purposeful discrimination against Plaintiff because of her race." Third Am. Compl. ¶ 120. She adds that "[n]either the Cook County Sheriff's Police nor the individuals in this lawsuit engage in the same kind of misconduct during the traffic stops of the non-minority race." *Id.* ¶ 123.

Defendants argue that Hicks has not sufficiently alleged intentional discrimination, to which Hicks responds that "Plaintiff does make such an

allegation, namely that the scheme was, 'purposeful discrimination because of her race.'" Pl.'s Resp. Br. at 17. Hicks goes on to state in the response brief: "[t]he thrust of Plaintiff's claim is that the Sheriffs use this tactic against African Americans on a widespread basis and against white citizens never or almost never. ... Defendants do not extort white citizens. The defendants follow an implicit theme in this case, that people will not care about the widespread extortion of black citizens, and Plaintiff looks forward to testing this theory in front of a jury." *Id.* (internal citations omitted).[18]

The problem with this claim is that Hicks has not pled any *facts* that give rise to a plausible inference intentional racial discrimination. In saying that the officers engaged in "purposeful discrimination against Plaintiff because of her race," Third Am. Compl. ¶ 120, Hicks is merely offering a legal *conclusion*, which this Court need not accept. *See Iqbal*, 556 U.S. at 678-79; *see also McDonald by McDonald v. Haskins*, 1991 WL 61036, at *1 (N.D. Ill. Apr. 10, 1991), *aff'd*, 966 F.2d 292 (7th Cir. 1992) ("[P]laintiff's conclusory allegation that defendant mistreated him because he is black is insufficient to state an equal protection claim. Plaintiff has failed to plead

---

[18] Hicks also says in her response brief that "it may turn out that her equal protection claim may be better proved pursuant to 42 U.S.C. § 1985, as Plaintiff has already set forth sufficient facts in her complaint of (1) a conspiracy motivated by racial animus; (2) a purpose of depriving African Americans of equal protection of the laws; (3) acts in furtherance thereof; and (4) injury to person or property or a deprivation of any right or privilege." Pl.'s Resp. Br. at 17-18. The Court does not address this argument, because it was not in the Complaint, but for the purposes of evaluating an equal protection claim, Hicks would fail under either Section 1983 or Section 1985, because she has not plausibly alleged the largely similar element of purposeful discrimination required under either statute. *See, e.g., Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 311 (7th Cir. 1996) ("A plaintiff raising a claim under § 1985(3) must allege (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of the alleged conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens.")

any facts, apart from his own race, from which the court can draw an inference that defendant's actions were at all motivated by plaintiff's race.") (internal citations omitted); *Jones v. City of Chicago*, 639 F. Supp. 146, 152 (N.D. Ill. 1986) ("[V]ague and conclusory allegations of race discrimination may not form the basis of a complaint.").

Nothing in the pleadings suggests that the relevant officers treated Hicks differently because she was black. The allegations that the officers do not treat non-minorities this way during traffic stops, Third. Am. Compl. ¶ 123, is a conclusion, rather than a set of factual allegations.[19] The same goes for the even broader allegation, *id.*, that the Sheriff's Office as a whole targets racial minorities. The equal protection claim is dismissed.

## G. *Monell* claims (Counts Seven and Thirteen)

In Counts 7 and 13, Hicks brings *Monell* claims against the Cook County Sheriff's Office and the Village of Lynwood. To hold either entity liable under Section 1983, Hicks needs to adequately plead: (1) the deprivation of an underlying substantive right; (2) the "existence of an 'official policy' or other governmental custom"; and (3) that this policy or custom is the "moving force" behind the deprivation of her substantive constitutional rights. *See Teesdale v. City of Chi.*, 690 F.3d 829, 833 (7th Cir. 2012). Defendants argue that Hicks has insufficiently pled

---

[19] Hicks alleges that the six traffic stops listed in Paragraph 81 of the complaint all involved African-American victims. But only one of those stops even involved one of the Defendants here (Murphy), and even as to Murphy, that one additional alleged stop is not enough to infer the specific targeting of racial minorities. Perhaps discovery on the traffic stops conducted by the Defendants will reveal otherwise, not just as to Murphy but the other officers, but the current complaint is not sufficient.

the *Monell* claims. Defs'. Mot. to Dismiss at 17-20; Lynwood Mot. to Dismiss. The Court agrees.

Hicks must adequately allege (and, ultimately, prove) how the Sheriff's Office or Village of Lynwood *themselves*, and not just the individual police officers, were responsible for causing the constitutional deprivations. *See Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007) ("municipal liability is limited to action for which the municipality is actually responsible"). In other words, Hicks has to adequately allege that the policies or customs of the Office or of Lynwood *caused* the deprivation of her constitutional rights. To try satisfying the causation element, Hicks can: (1) allege repeated constitutional violations to raise the inference that the Office or Village was "aware of the risk created by the custom or practice … and failed to take appropriate steps," *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010), or (2) allege specific facts showing the risk was "so obvious" that the Office's or Village's policymakers were "deliberately indifferent" to it, *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). To prove that the Sheriff's Office or Lynwood had a deliberately indifferent policy or practice, Hicks must establish that there existed "a widespread practice that … is so permanent and well settled as to constitute a custom or usage with the force of law." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (internal quotation marks and citations omitted).Conclusory allegations alone are not good enough to state a *Monell* claim. *See McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011). Only specific *factual* allegations can support a *Monell* claim. *Elsayed v Vill of*

*Schaumburg*, 2015 WL 1433071, at *5 (N.D. Ill. Mar 26, 2015) (rehearsing the elements of a *Monell* claim in a complaint was inadequate without sufficient associated facts). The bulk of Hicks's *Monell* allegations are just conclusions. Third Am. Comp. ¶¶ 127-129, 131-137, 167-170.

It is true that Hicks does attempt to assert a few facts in support of a widespread custom, but most are ultimately irrelevant, having nothing to do with the constitutional deprivation Hicks herself allegedly experienced. For example, she lists multiple details about Defendant Officer Murphy's presence at the shooting of Laquan McDonald, *e.g.*, Third Am. Compl. ¶ 130(e) ("Defendant Murphy and the other unknown Sheriff's Deputy wore blue gloves at the scene for an unknown reason."), but those facts have no direct or inference-generating connection to the extortion alleged here. Other allegations similarly do not relate to gun-extortion scenarios like Hicks experienced, and instead are more general accusations of engaging in cover-ups or filing false police reports. *See, e.g.,* Third Am. Compl. ¶ 130(f) ("The Chicago Police Department similarly failed to report the presence of Defendant Murphy or any other Sheriff's deputies as located at the scene of the murder or otherwise witnesses to any part thereof, in spite of the fact that apparently Defendant Murphy claims to have heard the last breath of Laquan McDonald."); *id.* ¶ 164(a) ("Defendant Mears, as Chief of the Lynwood Police Department, participated in the cover up of the beating of Randolph Holmes in 2013.").

Hicks comes closest to alleging relevant facts when she lists the six other traffic stops where someone allegedly was extorted. Third Am. Compl. ¶ 81(A)-(F). But six incidents over a time period of 2010 through 2016 do not plausibly allege that the Sheriff's Office or the Village of Lynwood has a custom of gun extortion and record falsification so widespread as to have the force of law. Remember, Hicks must adequately allege a custom so firmly rooted that it can be plausibly cited as *causing* the specific constitutional deprivation to Hicks. The complaint does not live up to this task. (Indeed, in the allegations concerning the Village of Lynwood, only one officer (Officer Mears) is targeted as engaging in misconduct.)[20] Defendants' and Lynwood's Motions to Dismiss Counts Seven and Thirteen respectively are granted.

## H. Emotional Distress (Count Nine)

Defendants' only argument for dismissal of Hicks's state-law claim for intentional infliction of emotional distress is that a court disposing of a federal claim should relinquish jurisdiction over supplemental state-law claims. Defs'. Mot. to Dismiss at 22, citing *Groce v. Eli Lilly &. Co.*, 193 F.3d 496, 501 (7th Cir. 1999). But because some of Hicks's federal claims survive, there is no basis to relinquish supplemental jurisdiction.

What's more, at this stage, Hicks has adequately pled facts to plausibly state a valid claim for intentional inflection of emotional distress. Under Illinois law, a claim for intentional infliction of emotional distress requires that the plaintiff

---

[20] It is worth mentioning that there are lawful gun-exchange programs where law enforcement takes official custody (and then enters into inventory) guns in exchange for some consideration. Of course, extorting guns, making threats of false charges, and failing to inventory the guns are an entirely different matter.

adequately plead that "(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended that his conduct should inflict severe emotional distress, or knew that there was a high probability that his conduct would ... and (3) the defendant's conduct in fact caused severe emotional distress." *Cook v. Winfrey,* 141 F.3d 322, 330 (7th Cir. 1998) (quoting *Doe v. Calumet City,* 641 N.E.2d 498, 506 (Ill. 1994)). Taking Hicks's allegations as true at this stage, it is more than plausible that officers' alleged extortion comprises extreme and outrageous behavior. Nor is it implausible that the officers intended to inflict emotional distress, which after all was the means to get Hicks to obtain the guns. And in light of the extortive nature of the alleged misconduct, it is plausible that the officers caused severe emotional distress. This claim survives.

## I. Procedural Due Process (Count 10)

Hicks' tenth count alleges a violation of procedural due process: "The deprivations of Plaintiff's liberty and property, as alleged throughout this complaint, were made by [Cook County Sheriff's Office] and its agents arbitrarily and without any procedural safeguards of any kind. … Had Defendants allowed some due process in this case, neither Plaintiff's person nor Plaintiff's property would have been seized." Third Am. Compl. ¶¶ 147, 150. To successfully allege a procedural due process claim, Hicks must allege that she was deprived, through state action, of a constitutionally protected interest in life, liberty, or property without due process of law. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Typically,

due process requires notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

But procedural due process does not always require, as Hicks alleges, Third Am. Compl. ¶ 150, a notice and opportunity to be heard *before* the deprivation occurs. *Post*-deprivation process might very well satisfy procedural due process requirements:

> The constitutional violation [of procedural due process] actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.

*Zinermon*, 494 U.S. at 126. In a situation like Hicks's, where officers are acting not pursuant to an official policy but instead out of their own personal interests, there is no way (not to mention no time) to somehow insert sufficient process as a buffer between the officer and the alleged victim:

> A State cannot possibly ensure hearings before its officers act randomly and without authority, and the State cannot be required constitutionally to do the impossible by providing predeprivation process. Accordingly, all the process the victim of such a deprivation is due is an effective post-deprivation state law tort remedy against the offending officer.

*White v. City of Chicago*, 149 F. Supp. 3d 974, 977 (N.D. Ill. 2016) (internal citations omitted). Here, neither Illinois nor the County nor the Village of Lynwood could provide pre-deprivation process as the allegedly rogue officers made the traffic stop on Jasmin and extorted Hicks. The state's courtroom doors are open to Hicks to

pursue relief through a post-deprivation legal remedy. No procedural due process violation occurred, so Count Ten is dismissed.

## J. Substantive Due Process (Count 11)

Next, Hicks alleges a violation of substantive due process. Third Am. Compl. ¶¶ 152-155. The path for assessing substantive due process claims is well elaborated in *Christensen v. County of Boone, IL*, 483 F.3d 454 (7th Cir. 2007): (1) the first step is "to provide a careful description of the interest said to have been violated," *id.* at 462 (internal quotation marks and citations omitted); then (2) to "determine whether that interest is fundamental—that is, whether it is so deeply rooted and sacrosanct that no amount of process would justify its deprivation," *id.* (internal quotation marks and citations omitted); then (3) if a fundamental right is determined to be at stake, a court determines "whether the government has interfered directly and substantially with the [plaintiff's] exercise of that right," *id.* (internal quotation marks and citations omitted); and finally, (4) if the government has so interfered, a court asks whether the governmental action can find "reasonable justification in the service of a legitimate governmental objective, or if instead it more properly is characterized as arbitrary, or conscience shocking, in a constitutional sense," *id.* (internal quotation marks and citations omitted).

But there is a further important limitation on substantive due process claims: if a more specific right addresses the alleged conduct, then that is the right the plaintiff must pursue, not the more generalized notion of substantive due process. *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Because the Fourth Amendment

provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct [here, excessive force], that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.") Once a seizure is alleged, evaluation of Hicks's claim proceeds down the path of Fourth Amendment analysis (as discussed earlier). The more specific Fourth Amendment claim precludes the viability of a substantive due process claim.

Defendants also argue that they are entitled to qualified immunity against Hicks's substantive due process claim. Defs'. Mot. to Dismiss at 14-16; Mears' Mot. to Dismiss at 13-15; Defs'. Rep. Br. at 11-12; Mears' Rep. Br. at 7-8. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The Court has already held that the Fourth Amendment claim precludes Hicks's substantive due process claim, but even if that is wrong, at the very least Defendants are right that there is no clearly established law that would characterize the allegations as a viable substantive due process claim.

## K. Supervisory Liability (Count 12)

It is well established that the *respondeat superior* theory of liability is not applicable to Section 1983 claims. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) ("The doctrine of *respondeat superior* does not apply to § 1983 actions; thus to be held individually liable, a defendant must be 'personally responsible for the deprivation of a constitutional right.'") (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001)). So the allegations of supervisory liability, based simply on Defendants O'Malley's and Dwyer's supervisory status, do not state a claim. *See Iqbal*, 556 U.S. at 677 ("In a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer.") The supervisory liability claim is dismissed, though O'Malley and Dwyer may still be held liable for their own conduct and any conduct that they personally caused.

## L. Indemnification (Count Eight)

Finally, because some of Hicks's claims survive, the indemnification count survives to the same extent.

## IV. Conclusion

For the reasons discussed, the following claims survive:

- Fourth Amendment unreasonable seizure (Count Two);
- Fourth Amendment unreasonable search (Count Three);
- Failure to intervene on the Fourth Amendment claims (Count Four);
- Indemnification (Count Eight); and
- Intentional infliction of emotional distress (Count Nine).

The following claims are dismissed:

- RICO (Count One);
- Section 1983 "conspiracy" (Count Five);
- Equal protection (Count Six);
- *Monell* claim against the Cook County Sheriff's Office (Count Seven);
- Procedural due process (Count Ten);
- Substantive due process (Count Eleven);
- "Supervisor" liability under Section 1983 (Count Twelve); and
- *Monell* claim against the Village of Lynwood (Count Thirteen).

On or before October 6, 2017, the parties shall file a status report proposing a discovery schedule. At the very least, Rule 26(a)(1) disclosures are due by October 24, 2017. The first round of written discovery requests may be issued immediately, and must be issued no later than October 31, 2017. Also, Hicks and the plaintiffs in the related case, 17 C 4951, shall confer with the defense about filing a consolidated amended complaint on this case's docket. The status hearing of October 10, 2017 remains in place.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 29, 2017