| | | |
|---|---|---|
| Patricia Hicks, Lorenzo Smith, and Jasmin McBride, | ) ) | |
| | ) | |
| Plaintiffs, | ) | No. 15 C 6852 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| Cook County Sheriff's Office, Officer Murphy, Officer Mousel, Officer Dwyer, Officer Doyle, Officer Mears, Officer O'Malley, Officer Gosling, and the Village of Lynwood, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Shortly after midnight on July 2, 2015, Lorenzo Smith and Jasmin McBride were pulled over by Cook County Sheriff's police on the south side of Chicago. This traffic stop gave rise to two civil-rights lawsuits—one by McBride and Smith, and another by Patricia Hicks, McBride's mother—which were eventually consolidated in this case. *See* R. 130.[1] In their Joint Amended Complaint, the Plaintiffs named the Cook County Sheriff's Office and the Village of Lynwood as defendants, along with several of their respective police officers. R. 121, Joint Am. Compl. All three Plaintiffs brought an illegal-seizure claim and a failure-to-intervene claim under 42 U.S.C. § 1983 (Counts 1 and 3), as well as a claim for indemnification against the Village of Lynwood and the Cook County Sheriff's Office under 745 ILCS 10/9-102 (Count 5);

---

[1]Citations to the record are noted as "R." followed by the docket number.

McBride and Hicks also brought an illegal-search claim (Count 2); and Hicks brought a state-law claim for intentional infliction of emotional distress (Count 4).[2] *Id.*

In May 2019, the Defendants filed three separate motions for summary judgment: one motion by the Cook County Sheriff's Office, Sergeant Michael Dwyer, Officer Robert Mousel, and Officer James Gosling (the "County Defendants"), R. 252; another motion by Lynwood Officer Michael Mears and the Village of Lynwood, R. 257; and the third motion by Cook County Sheriff's Officers Michael Doyle and Adam Murphy (who are represented separately from the other Cook County defendants), R. 260.[3] For the reasons discussed below, the Defendants' motions are granted in part and denied in part.

## I. Background

In deciding the Defendants' motions for summary judgment, the Court views the evidence[4] in the light most favorable to the Plaintiffs, the non-movants.[5]

---

[2]The Court has federal-question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

[3]The Defendants' summary judgment motions and opening briefs will be cited only by their respective docket numbers.

[4]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "County DSOF" for the Cook County Sheriff's Office, Sgt. Dwyer, and Officers Mousel and Gosling [R. 254]; "Mears/Lynwood DSOF" for Officer Mears and the Village of Lynwood [R. 258]; "Murphy/Doyle DSOF" for Officers Murphy and Doyle [R. 262]; and "PSOF" for the Plaintiffs' combined additional statement of facts [R. 272]. The Plaintiffs' responses to the various statements of fact are identified as "Pls.' Resp." followed by the appropriate statement of fact—for example, "R. 266, Pls.' Resp. County DSOF." The Defendants' combined response to the Plaintiffs' combined additional statement of facts is identified as "Defs.' Resp. PSOF" [R. 283].

[5]The Plaintiffs failed to cite to either the record or the Local Rule 56.1 Statements when making factual assertions in their combined response brief. *See generally* R. 271, Pls.' Resp. Br. The County Defendants argue that this is grounds to grant summary judgment in their favor, or at least to reject wholesale the factual assertions in the Plaintiffs' brief. Similarly, Officer Mears and the Village of Lynwood ask the Court to strike the facts referenced in the Plaintiffs' response brief. R. 281, Mears/Lynwood Reply Br. at 3-4. It is true

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The facts narrated here are undisputed unless otherwise noted.[6]

In the early morning hours of July 2, 2015, Lorenzo Smith was driving a blue Oldsmobile belonging to his girlfriend, Jasmin McBride, who was asleep in the front passenger seat. R. 254, County DSOF ¶¶ 2, 8, 11; R. 265-26, CCSPD Mem. at 1[7]; R. 254-3, Smith Dep. at 142:7-16. Smith was also transporting a passenger (who was in the back seat) for a ride-share service. *See* County DSOF ¶ 8; R. 272, PSOF ¶ 1. Around 12:53 a.m., Smith was pulled over by a Cook County Sheriff's Police Department car while driving eastbound on 69th Street near Ashland Avenue in Chicago. *See* CCSPD Mem. at 5; R. 268, Pls.' Resp. Mears/Lynwood DSOF ¶ 4. Driving

that the better practice is to cite the 56.1 Statements (and, in this Court's view, the best practice is to parallel cite). But the rule does not explicitly require it, nor does this Court's Standing Order on Summary Judgment motions, so the Defendants' requests are denied.

    [6]Murphy and Doyle also argue that the Court should deem Paragraphs 4, 18, 20-22, and 28 of their Statement of Facts [R. 262] admitted. R. 282, Murphy/Doyle Reply Br. at 2-3. That request is denied in large part. Paragraphs 4, 18, 21-22, and 28 cannot be deemed admitted wholesale because the Plaintiffs properly dispute at least some of the factual allegations with citations to the record. *See* R. 267, Pls.' Resp. Murphy/Doyle DSOF ¶¶ 4, 18, 21-22, 28. Although Murphy and Doyle take issue with the fact that the Plaintiffs' responses often cite the Plaintiffs' *own* statement of additional facts (instead of directly to the record), Local Rule 56.1 does not explicitly bar this practice. Nevertheless, the last sentence in Paragraph 18—that "Smith had his cellphone with him while he was in the police vehicle[,] Murphy/Doyle DSOF ¶ 18—is deemed to be admitted, because the paragraph that the Plaintiffs cite in response (and the underlying evidence) fails to adequately dispute it. *See* Pls.' Resp. Murphy/Doyle DSOF ¶ 18; PSOF ¶ 16. For the same reason, all the statements in Paragraph 4 are deemed to be admitted, except for the allegation that "Officer Doyle was not present for the traffic stop[,] *see* Pls.' Resp. Murphy/Doyle DSOF ¶ 4; all the statements in Paragraph 21 are deemed to be admitted, except for the allegation that "Hicks did not seem upset at all," *id.* ¶ 21; and the statement in Paragraph 22 that "[t]he two didn't speak to each other" is admitted, *id.* ¶ 22. In addition, Paragraph 20 of Murphy and Doyle's Statement of Facts is admitted in its entirety because the Plaintiffs fail to cite to any part of the record. *See id.* ¶ 20.

    [7]With respect to the Cook County Sheriff's Police memos (as well as the text messages between Murphy and Hicks, R. 254-13), this Opinion will cite to the page numbers assigned by the electronic filing system as opposed to the internal Bates numbers, for convenience's sake.

3

the CCSPD car was Officer Adam Murphy, accompanied by Officer Robert Mousel in the front passenger seat (also of the CCSPD) and Officer Michael Mears (from the Village of Lynwood) in the backseat; all three officers were assigned to the Cook County Sheriff's Street Crimes Suppression Unit. *See* County DSOF ¶ 9; R. 258, Mears/Lynwood DSOF ¶¶ 1-2. According to the Defendants, Officers Murphy and Mousel saw Smith make a right turn without properly signaling, at which point Murphy initiated the traffic stop. County DSOF ¶ 10; Mears/Lynwood DSOF ¶ 6. Although the Plaintiffs assert that Smith did not make a turn at all, *see, e.g.*, R. 266, Pls.' Resp. County DSOF ¶ 10, Smith testified (during his deposition) that he did, at some point, have to turn right onto 69th Street, Smith Dep. at 137:18-138:3. The confusion appears to derive from Smith's testimony just a few moments prior. Defense counsel had asked Smith what McBride was doing when they were pulled over, and Smith answered that she was in and out of sleep. *Id.* at 136:24-137:5. Then counsel asked, "Had you just made a turn onto 69th Street?", and Smith answered, "No." *Id.* at 137:6-8. Ultimately, although there is no dispute that Smith did make a turn at some point, the circumstances of what the officers saw (and how they saw it) are still relevant, as discussed later.

Moving on to the traffic stop itself, the parties dispute who was there. The individual Defendants deny that all six of them were present together "at any one point during the events at issue[,]" including when Smith and McBride were pulled over. R. 283, Defs.' Resp. PSOF ¶ 2. Although it is undisputed that Murphy, Mousel, and Mears were in the car that pulled Smith and McBride over, Pls.' Resp. County

DSOF ¶¶ 9-10, Murphy testified that Sergeant Dwyer was also there (though in a different vehicle), *see* R. 254-9, Murphy Dep. at 113:9-114:6. In contrast, Dwyer testified that he had been at the police department's command post when Smith and McBride were brought in. R. 254-7, Dwyer Dep. at 57:6-58:1. In contrast yet again, in their Answer to the Plaintiffs' Joint Amended Complaint, the individual defendants— including Officers Michael Doyle and James Gosling—admitted to conducting the traffic stop. R. 272-3 at ¶ 13. But like Dwyer, Officers Doyle and Gosling both testified that they were *not* at the traffic stop. *See* R. 254-10, Gosling Dep. at 55:16-59:14; R. 254-11, Doyle Dep. at 44:17-25.

In any event, it is undisputed that when Officer Murphy approached Smith and asked for Smith's license and registration, Smith admitted that he did not have a valid driver's license. County DSOF ¶ 13. Murphy then asked Smith to get out of the Oldsmobile, placed Smith under arrest, and took him to stand near the back of the police car with Officer Mears. *Id.* ¶¶ 13-14. After this, Murphy conducted a pat-down search of McBride and collected her personal items. *Id.* ¶ 15. According to the Defendants, Murphy found and recovered a quarter-sized package containing eleven pieces of an off-white, rock-like substance from McBride's pocket, which Murphy suspected to be crack cocaine. *Id.*; Mears/Lynwood DSOF ¶¶ 19-20; Defs.' Resp. PSOF ¶ 5. McBride disputes this discovery, *see, e.g.*, Pls.' Resp. County DSOF ¶ 15, testifying that she did not have any crack cocaine on July 2, R. 254-2, McBride Dep. at 306:20-22, and indeed that she had never used or possessed crack cocaine, *id.* at 174:16-20. None of the other Defendants saw Murphy actually recover the crack

cocaine from McBride's pocket. *See, e.g.*, R. 254-6, Mears Dep. at 147:23-148:18; R. 254-8, Mousel Dep. at 135:16-136:8. Mears testified that during the traffic stop, after Murphy had allegedly recovered the cocaine, Murphy came up to Mears "and just dangled it kind of by … the knotted end," telling Mears that "[s]he had rock on her." Mears Dep. at 145:10-146:12. But Smith—who was allegedly standing with Mears at the time—testified that that he did not see a knotted plastic bag at the traffic stop. Smith Dep. at 320:22-321:2. Similarly, McBride testified that Murphy "never mentioned anything about any narcotics," McBride Dep. at 364:22-365:6, and that she did not find out about the officers' claim that she had drugs on her until around two *years* later, *id.* at 61:4-7, 364:19-21. In any case, after allegedly recovering the crack cocaine from McBride, Murphy placed her under arrest. County DSOF ¶ 18.

Eventually, both Smith and McBride were placed in the backseat of the police car and taken to the Sheriff's Office Command Center (which the parties sometimes call the "Command Post") at 59th and Wood. County DSOF ¶¶ 18-19. The Command Post was an abandoned parking lot where Cook County had several trailers for booking arrestees, storing evidence, and serving as the command center for supervisors and staff. *See* PSOF ¶ 10; Murphy Dep. at 129:1-14. According to Murphy, while he was filling out paperwork at the Command Post, McBride—supposedly of her own accord—told him that she knew the location of some firearms that she wanted to get off the street. Murphy Dep. at 132:20-133:4, 135:21-136:5, 192:15-25; County DSOF ¶ 21; Mears/Lynwood DSOF ¶ 31. Murphy testified that he promptly reported what McBride said to Sergeant Dwyer (Murphy's supervisor at the time).

Murphy Dep. at 180:23-181:7; County DSOF ¶ 21. *See also* Mears/Lynwood DSOF ¶ 31; Defs.' Resp. PSOF ¶ 12. But the Plaintiffs have a 180-degree-different version of events. McBride testified that, after Murphy handcuffed her on-location at the traffic stop, he asked her whether she was on either parole or probation. McBride Dep. at 351:2-4, 354:8-16, 356:10-13. After Murphy found out that she was on probation, Murphy told McBride to get him three guns, two for her (that is, to release her) and one for the car (that is, so the car would not get towed). *Id.* at 138:12-16, 144:20-24; *see also id.* at 165:17:21 (McBride testifying that Murphy said, "okay, this is the plan: You get me some guns, and we will not tow your car. He said, two for you and one for the car."). McBride also testified that no one else was "present" for this conversation, *id.* at 356:13-16, but noted that Smith was handcuffed near the police car with another officer, *id.* at 351:16-352:1, 354:17-20. For his part, Smith testified that after McBride was arrested and placed in the police car, the police officer who arrested him—who the parties agree was Murphy—came over and asked Smith if he loved Jasmin. Smith Dep. at 153:3-7. When Smith answered yes, Murphy told him that in order to get Smith, McBride, and the car "'out this situation,' he [Murphy] would need three handguns." *Id.* at 153:7-15.[8]

---

[8]Defendants contend that "McBride admits that … any conversation with Smith regarding guns did not occur until they were at the command post." Defs.' Resp. PSOF ¶ 9. But the testimony that they cite, McBride Dep. at 184:7-17, 356:14-16, does not support that contention. Although McBride testified that Murphy allowed Smith to drive away later that night without a license and that Murphy told Smith, "we're going to see how much you love her[,]" it is far from clear that McBride was testifying as to *when* Murphy made that statement, nor does McBride's testimony preclude the possibility that Murphy was simply repeating his earlier statement. *See id.* at 184:7-17. Similarly, McBride's testimony that no one else was present during her conversation with Murphy at the traffic stop does not

The parties also dispute who spoke with Smith and McBride at the Command Post. The Plaintiffs assert that Officers Murphy, Mousel, and Dwyer all talked to McBride and Smith. PSOF ¶ 11. Mears testified that when the group arrived at the Command Post, he saw Murphy, Mousel, and Dwyer talking to Smith and McBride for around 15 minutes. Mears Dep. at 157:2-9, 157:22-159:5. Doyle testified that, although he did not see them talking, he did see several officers standing around Smith and McBride at the Command Post, including Dwyer and Murphy. Doyle Dep. at 36:1-37:11.

Meanwhile, it is undisputed that while she was in the back of the police car at the Command Post, McBride called Gerald "Pudge" Adams, an ex-boyfriend of hers, and told him that she needed some guns or else she would go to jail. Defs.' Resp. PSOF ¶ 13; McBride Dep. at 44:5-14, 69:18-19, 70:3-20. According to McBride, when the police "told [her] to call somebody," she called several numbers first, McBride Dep. at 109:14-111:15, but Pudge was the kind of person who could get "whatever you ask[,]" *id.* at 110:8-16; County DSOF ¶ 24. Pudge responded that he knew where she could get the guns, but that someone would have to go pick them up. McBride Dep. at 70:21-71:5; Defs.' Resp. PSOF ¶ 13; Pls.' Resp. Mears/Lynwood DSOF ¶ 35. After this, McBride called her mother—Plaintiff Patricia Hicks—and told her to call Pudge. McBride Dep. at 71:11-14; Mears/Lynwood DSOF ¶ 38; R. 262, Murphy/Doyle DSOF ¶¶ 5, 9-10.

---

preclude the existence of a separate conversation between Murphy and Smith. *See id.* at 356:14-16.

Indeed, McBride called her mother several times that night. McBride Dep. at 368:1-8; County DSOF ¶ 26. One of the phone calls, around 1:45 a.m., was recorded, and McBride can be heard saying that "they on their way to come get you now." R. 254-12, Exh. K (Audio Recording). Hicks said that she believed that she could get one gun from Pudge, but that she did not know if she could get two, at which point McBride responded that the guns belong to Pudge. Exh. K (Audio Recording); *see* County DSOF ¶ 31; Murphy/Doyle DSOF ¶¶ 8-10. According to Hicks, McBride also told her that McBride was being held by police and that the police were "going to give [McBride] a case, if [she] didn't get any guns, because [she's] on probation." R. 254-4, Hicks Dep. No. 1 at 80:1-12. Hicks also testified that, while she was on the phone with her daughter, she could hear unidentified police in the background telling McBride what to say, and that McBride relayed messages from the police to Hicks. Hicks Dep. No. 1 at 84:8-17, 197:5-15, 198:15-199:13; PSOF ¶ 14. In fact, according to McBride, the police officers were "talking through [her] because [she] was on the phone with [her] mom"; they told Hicks that they had "a certain amount of minutes because [they had] to shut this down" so if Hicks promised to give the officers the guns, then they would hold McBride until Hicks got the guns the next day. McBride Dep. at 180:1-10. McBride also testified that she never heard her mom agree to go with the officers, but the officers "pretty much" "demanded" that Hicks go with them. *Id.* at 182:2-9. When Hicks told McBride on the phone that "it was real late, and she's scared to go out[,]" a police officer said, "I'm going to come get you." *Id.* The Defendants deny that any officer told McBride what to say to Hicks, but they offer no

evidence to conclusively dispute this. Defs.' Resp. PSOF ¶ 14. Although the audio recording does not contain any statements by police, there is no evidence to foreclose the possibility that this occurred in one of the other phone calls between Hicks and her daughter. *See id.*

As for Murphy, he testified that *Dwyer* and McBride made the arrangements for picking up the firearms. Murphy Dep. at 183:4-6; Defs.' Resp. PSOF ¶ 12. Although the Defendants dispute "the characterization of the agreement as an 'exchange of firearms for Ms. McBride's freedom[,]'" they do admit that Dwyer, as supervisor, "had to approve the plan to pick up illegal guns." Defs.' Resp. PSOF ¶ 12. In fact, McBride testified that there was a man, other than Murphy, who appeared to be "running" the operation; this man, as well as the officers that were in the car and the officers who picked up her mother, all talked to her at the Command Post about obtaining the guns. *See* McBride Dep. at 178:9-20, 180:11-20. At one point, right after Murphy spoke to the man who was "running" things, McBride testified that Murphy said to her, "I don't care how she gets it. We just need them." *Id.* at 361:21-362:11. In contrast, Dwyer, Mousel, and Gosling all testified that they had no knowledge of Murphy's discussions with Hicks about the firearms. County DSOF ¶ 67; Dwyer Dep. at 111:9-12; Mousel Dep. at 218:7-12; Gosling Dep. at 6:12-14, 142:3-15. *See also, e.g.*, Mears Dep. at 109:22-111:6 (Mears testifying that it was his understanding that Hicks had agreed to tender the stolen guns to the officers, and that McBride told Dwyer and Murphy about this arrangement at the Command Post). But the Defendants do admit that Dwyer, as supervisor, assigned Mears and Doyle to pick up

Hicks and take her to go get the guns. Defs.' Resp. PSOF ¶¶ 12, 17. Nevertheless, Dwyer insists that he did not give Doyle or Mears any other instructions, and that all he knew was that Hicks had guns, was hiding guns, or knew the location of illegal guns. County DSOF ¶¶ 36-37; Dwyer Dep. at 71:15-21, 76:5-12.

Before Mears and Doyle went to get Hicks, one of the police officers told Smith (according to him) to go get the guns from Pudge himself, but Smith said that he did not know where Pudge lived, and that he did not know Pudge "like that[,] to be knocking on his door." Smith Dep. at 176:10-21. Although it is unclear how it came about, Smith ultimately ended up going with the officers to pick up Hicks. *Id.* at 178:22-24 (Q: "At some point, did you agree to go with the officers anywhere?" A: "To pick up Patricia, yeah."). In fact, even though both Mears and Doyle testified that Smith did not go with them, Mears Dep. at 161:19-23; Doyle Dep. at 38:21-39:2, the Defendants do not dispute that Smith was there, *see, e.g.*, Defs.' Resp. PSOF ¶¶ 16-17; Murphy/Doyle DSOF ¶ 18. *See also* Hicks Dep. No. 1 at 137:13-138:2; Smith Dep. at 184:21-24 (both Hicks and Smith testifying that Smith was in the car). Also, Smith testified that his hands were handcuffed to the front (as opposed to behind his back, or to any objects) during the ride with Mears and Doyle (this is relevant for reasons explained later in the Opinion). *See* Smith Dep. at 193:2-18.

Once the officers got to Hicks' house, Smith called Hicks on his cell phone to let her know that they had arrived. Pls.' Resp. County DSOF ¶ 42; R. 267, Pls.' Resp. Murphy/Doyle DSOF ¶ 21. Hicks then came outside and got into the backseat of the officers' unmarked police SUV, where Smith was also sitting. Pls.' Resp. County

DSOF ¶ 42; Pls.' Resp. Murphy/Doyle DSOF ¶ 21. Mears was driving, and Doyle was in the front passenger seat. Pls.' Resp. County DSOF ¶ 40; Pls.' Resp. Mears/Lynwood DSOF ¶ 55. Hicks testified that when she got in the car, the officer in front of her— that is, Doyle—told her that McBride would be charged with a crime if she did not come up with guns. *See* Hicks Dep. No. 1 at 226:2-8; *see also* R. 254-5, Hicks Dep. No. 2 at 17:24-18:4 (testifying that she got into the back passenger side of the car). But even though McBride had already informed Hicks that Pudge had guns she could pick up, Hicks initially told Mears and Doyle that she did not know where to get them. Pls.' Resp. County DSOF ¶ 46; Hicks Dep. No.1 at 135:18-136:1. One of the officers then urged, "Look in your phone. Can't you call somebody?" Pls.' Resp. County DSOF ¶ 46; Hicks Dep. No. 1 at 136:2-3; Pls.' Resp. Mears/Lynwood DSOF ¶ 57. Hicks then pulled out her phone and, as she scrolled through her contacts, Doyle watched and asked her for information about various people on her contact list. Hicks Dep. No.2 at 23:7-16, 25:8-26:3; Pls.' Resp. Mears/Lynwood DSOF ¶ 57. *But see* Smith Dep. at 198:16-22 (Smith testifying that he did not see Hicks take out her cellphone when she got in the car). When Hicks got to the contact number for Pudge, Hicks told Doyle that Pudge was McBride's "baby daddy." Hicks Dep. No. 1 at 136:15-21. *See also* Pls.' Resp. County DSOF ¶ 49; Pls.' Resp. Murphy/Doyle DSOF ¶ 12. Hicks testified that Doyle then told her to call Pudge, so she did, putting the call on speakerphone. Pls.' Resp. Mears/Lynwood DSOF ¶ 58; Hicks Dep. No. 1 at 136:15-24; Hicks Dep. No. 2 at 26:10-12, 26:24-27:4, 28:17-20. Pudge then gave Hicks an address to go to for the

firearms. Hicks Dep. No. 1 at 136:22-24; Pls.' Resp. County DSOF ¶ 51; Pls.' Resp. Mears/Lynwood DSOF ¶ 58.

The Defendants insist that Officers Mears and Doyle never physically touched Hicks' phone, citing Hicks' testimony that she was "more than positive" that she was holding the phone the entire time. *See* County DSOF ¶¶ 47-48; Mears/Lynwood DSOF ¶ 59; Hicks Dep. No. 2 at 42:18-20. But the Plaintiffs dispute this, pointing to Doyle's testimony that he "believe[d] her phone was set up front on the console" of the car, a common practice to ensure that "no one can make calls … [to] ambush" the officers. PSOF ¶ 20; Doyle Dep. at 104:13-25. *See also* Hicks Dep. No. 2 at 42:22-24 (Hicks testifying, "I don't remember if they ever took it out of my hand, I don't remember. I remember us going through it together.").

In any case, after the phone call with Pudge, the officers drove Hicks to a house on Indiana Street. Defs.' Resp. PSOF ¶ 21. The officers parked about a block away from the house, Hicks Dep. No. 2 at 32:6-21, and Smith testified that it was not possible to see Hicks walk up to the house from that vantage point, Smith Dep. at 200:3-18. *See also* Mears Dep. at 163:17-23 (Q: "Did you follow her to see where she was going?" A: "No, sir." Q: "Why not?" A: "Because I was a white guy in an all black neighborhood, that would have stuck out like a sore thumb."). Smith also testified that the doors of the police SUV were locked from the inside, so the officers had to get out and open the door for Hicks, Smith Dep. at 199:16-21; but Hicks testified that she was able to simply open the door herself, Hicks Dep. No. 2 at 46:12-14. Hicks' demeanor before she went up to the house, as well as her overall voluntariness, is

also disputed. The Defendants contend that Hicks never said that she did not want to go with them, nor did she ever express any fear or unwillingness. *See, e.g.*, County DSOF ¶ 32; Hicks Dep. No. 2 at 33:11-17); Defs.' Resp. PSOF ¶ 21; Mears Dep. at 163:24-25. But the Plaintiffs present a different story. McBride testified that Hicks told the officers on the phone that she was afraid to go out. PSOF ¶ 15; McBride Dep. at 182:2-4. Hicks testified that she told the officers she was scared to get out of the car, Hicks Dep. No. 1 at 220:3-10, and that one of the officers seemed to have seen her crying, Hicks Dep. No. 2 at 48:5-9. And Smith testified that Hicks was shaky and angry. Smith Dep. at 197:18-23.

Returning to the house on Indiana Street—when Hicks went to the front door and relayed Pudge's message to the residents of the house, a man swore at her and threatened her, causing her to back away and leave. Defs.' Resp. PSOF ¶ 22. But Hicks did not tell the officers what actually happened; instead, out of fear, she told them that nobody answered the door. *Id.* What happened next is (again) disputed. According to Smith, when they got back to Hicks' house, the officers told Smith and Hicks that "if [they] want[ed] to see Jasmin and if [Smith] want[ed] to stay free, [they] better have three guns by the time [the officers] get out of court" the next day. Smith Dep. at 212:24-213:5; *see* PSOF ¶ 23. Although Smith could not remember which officer said this, he did testify that "[b]oth of them was really saying the same thing." Smith Dep. at 213:18-22. Then, when Mears and Doyle took Smith back to the Command Post, they released him and gave him the keys to McBride's car (even though he had a suspended license), telling him to "have them guns tomorrow." *Id.* at

216:10-13, 217:3-7; *see* Defs.' Resp. PSOF ¶ 26. It is worth noting that, although the Defendants deny making any statement like that to *Hicks*, they provide no evidence to dispute that these statements were made to *Smith*. *See* Defs.' Resp. PSOF ¶¶ 23, 26. *See also* Doyle Dep. at 62:6-63:13; Mears Dep. at 168:13-24.

When the officers returned to the Command Post, Mears reported to Murphy that Hicks was not able to get any guns. Defs.' Resp. PSOF ¶ 25. Meanwhile, Hicks testified that shortly after she was dropped off at home, a police officer contacted her—via a phone call, she believed—and told her she had another chance to "save" her daughter. Hicks Dep. No. 1 at 228:14-23; PSOF ¶ 27. Specifically, the officer instructed her to get up and do what she had to do to get the guns, and that he would hold McBride until she did. Hicks Dep. No. 1Hicks Dep. No. 1 at 228:14-23; PSOF ¶ 27. Hicks understood this person to be Murphy, based in part on her discussion with him later that day. Hicks Dep. No. 1 at 233:2-21. *See* PSOF ¶ 27; Pls.' Resp. Mears/Lynwood DSOF ¶ 73 (Plaintiffs admitting that, after returning to the Command Post, Mears had no further involvement with the Plaintiffs). On the other hand, Murphy testified that his first communication with Hicks was not until later that day, when *she* contacted *him*. Murphy Dep. at 198:16-199:13; *see* Defs.' Resp. PSOF ¶ 27.

It is undisputed, however, that sometime after Mears spoke with Murphy back at the Command Post, Murphy and Gosling took McBride to lockup for the night on Dwyer's orders. *See* Defs.' Resp. PSOF ¶ 29; Pls.' Resp. County DSOF ¶ 34. According to Murphy, Dwyer instructed them to hold McBride so that the remaining

paperwork—"criminal complaints, felony 101s, … paperwork for Chicago to bring them into the system, their transmittal"—could be finished the next day. Murphy Dep. at 189:11-20, 191:16-19; *see* County DSOF ¶¶ 34-35. Both Murphy and Gosling's CCSPD memos state that they dropped McBride off at lockup around 3:00 a.m. *See* CCSPD Mem. at 4-5. Of course, the Plaintiffs dispute the reason why McBride was locked up. Aside from the various efforts to obtain guns, the Plaintiffs also point to McBride's arrest report. PSOF ¶ 28; Pls.' Resp. County DSOF ¶ 35. Specifically, then-Sergeant John Sullivan approved McBride's arrest report around one or two o'clock in the morning, and at that time, the report stated that McBride was "released without charges." R. 265-15, Sullivan Dep. at 44:6-11, 44:22-45:2. Although the Defendants disagree with the Plaintiffs' *interpretation* of this fact, they offer no evidence to dispute either the content the report or Sullivan's testimony. *See* Defs.' Resp. PSOF ¶ 28.

Back at home, after going back to sleep for a while, Hicks woke up sometime that same morning of July 2 and began searching for a gun. Hicks Dep. No. 1 at 261:16-23. Hicks described going to a corner on Wabash Street, near Prairie and 69th Street in Chicago, and walking up to four young guys who were standing there and asking them for help. *Id.* at 172:11-173:3. She "broke down and let them know what was going on, and they told [her] they was aware of it like it was normal." *Id.* at 173:3-5. One of those guys ended up selling Hicks a gun for $500.[9] *Id.* at 319:15-322:16.

_____

[9]Although Hicks confirmed that no police officer had told her to actually *buy* a gun at that point, she bought the guns anyway because Murphy told her to "do whatever [she] need[ed] to do" if she wanted her daughter; plus, she "knew [she] had to buy it" because

16

Hicks called Murphy afterwards to tell him, but he did not answer the call. PSOF ¶ 31. At 11:28 a.m., Murphy sent a text message to Hicks apologizing for not answering and letting her know that he would call as soon as he was done with court. R. 254-13, Hicks/Murphy Text Msgs. at 6. When Hicks texted Murphy to say that she only got one gun, he responded, around 11:31 a.m., that: "[t]he deal was 2 for your daughter and 1 for the car, the one last night was just to get her out right then." *Id.* A little over an hour later, Murphy added, "I will be out that way around 330, u need to have those items so I can release Jasmin." *Id.* at 7. Hicks told him that she had a second one but needed to "come up with 100 more dollars"; she then asked him if he would settle for two if she promised to get him a "third one later." *Id.* at 7-8. Murphy agreed, telling Hicks, "OK, if you definitely have 2, I will bring Jasmin back with me to grab the 2." *Id.* at 7. He also said that Hicks could take her time, because it would take him some time to "get home, change, and get Jasmin from holding." *Id.* at 8. But just 30 minutes later, Hicks texted Murphy that she got the second gun. *Id.*[10]

According to Murphy, when he notified Dwyer that Hicks had gotten the guns, Dwyer "advised [him] to release Jasmin pending the results from the crime lab." Murphy Dep. at 211:9-212:24. But Murphy also testified that his understanding of the agreement was that if Hicks got the guns, then McBride would be released. Murphy Dep. at 216:15-18. And in fact, when she *was* released, McBride remembers

"[a]in't nobody going to *give* you no gun." Hicks Dep. No. 1 at 262:24-263:5, 264:11-267:18 (emphasis added).

[10]The parties do not dispute the authenticity or content of these text messages, nor the fact that they were between Hicks and Murphy. *See* Defs.' Resp. PSOF ¶ 31. It is also undisputed that Smith gave Hicks money to help her purchase the guns (although it is not clear when in the timeline this happened). *See id.* ¶ 32.

Murphy telling her, "your mom bought firearms. She must really love you. I'm taking you home." McBride Dep. at 50:19-22. But afterwards, instead of driving her home, Murphy and Gosling drove McBride to an alley near Prairie and 69th Street. There, around 4 p.m., the officers recovered the firearms from a bag that Hicks had placed in the alley near some garbage cans. *See* Pls.' Resp. County DSOF ¶ 75; Hicks/Murphy Text Msgs. at 3; Defs.' Resp. PSOF ¶ 36. Although Murphy contends that he told McBride she was free to go at any time, he also testified that McBride did not get out of the car until after the officers had recovered the firearms. Murphy Dep. at 215:18-21. *See* R. 272-16, Smith 07/02/15 Alley Video; Gosling Dep. at 108:20-109:5 (Gosling testifying that he has no memory of anyone telling McBride that she was free to go).

Several days later, Murphy texted McBride about getting the third gun. *See* Defs.' Resp. PSOF ¶ 37; R. 272-22, McBride/Murphy Text Msgs. at 1. McBride told him that she had given the gun to Hicks, so he would need to call Hicks. *See* McBride/Murphy Text Msgs. at 2. Murphy eventually went to Hicks' home, thinking that he would be receiving another gun, but was instead confronted with Hicks' attorney. Defs.' Resp. PSOF ¶ 39. Murphy left the scene without incident. *Id.* The next day, Hicks and her counsel attempted to lodge a complaint with the Cook County Sheriff's Office but were unable to do so; the Plaintiffs claim that the Sheriff's Office refused to take the complaint, but the Defendants maintain that the Plaintiffs needed to notarize the complaint first and failed to do so. *See* Defs.' Resp. PSOF ¶ 40.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. New Claims

As a threshold matter, the Plaintiffs advanced several new claims in their response brief, alleging that the Defendants: (1) violated the Illinois prohibition against police negotiating with arrestees for their freedom under 725 ILCS 109-1 and 725 ILCS 5/107-6; (2) violated both the Thirteenth Amendment ban and the state-law ban, 720 ILCS 5/10-9(b), on involuntary servitude; (3) violated the prohibition against forced labor under 18 U.S.C. § 1589; (4) engaged in extortion and intimidation as

defined by 18 U.S.C. § 1951(b) and 18 U.S.C. § 875; and (5) engaged in bribery in violation of 720 ILCS 5/33-1. R. 271, Pls.' Resp. Br. at 11-17. The Defendants argue that they "have been unfairly surprised" by these claims, noting that they did not get the opportunity to take any discovery on them. *See* Mears/Lynwood Reply Br. at 3; *see also* R. 285, County Defs.' Reply Br. at 2; R. 282, Murphy/Doyle Reply Br. at 3-6. In particular, the Defendants point out that Plaintiffs' counsel made no mention of adding new claims when he (unsuccessfully) asked to amend the complaint during a March 2019 hearing—instead, he merely expressed the intent to conform the *facts* to those learned in discovery. *See* Mears/Lynwood Reply Br. at 2; R. 278, 3/21/19 Hearing Tr.

The Defendants are correct that the Plaintiffs' new claims constitute an improper attempt to substantively amend the complaint through summary judgment briefing. Although "a plaintiff generally can alter the legal theories asserted in its complaint, it cannot alter the factual basis of its complaint at summary judgment[,]" as this would constitute "an unacceptable attempt to amend the pleadings through summary judgment argument." *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 541 (7th Cir. 2018) (cleaned up).[11] In other words, a plaintiff's alteration of their original legal theory must be rejected if it also "necessarily alter[s] the fundamental factual allegations" in their complaint. *See id.* But even "if a complaint alters only the plaintiff's legal theory and not its factual allegations," the Court must

---

[11]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

then consider "the consequences of allowing the case to proceed under the new theory"—in other words, whether the new theory would cause unreasonable delay, make it more costly or difficult to defend the suit, or otherwise prejudice the defendant. *Id.*

Here, the Plaintiffs' argument that their claims merely recharacterize already-alleged facts is unconvincing. *See* Pls.' Resp. Br. at 13 n.2. The elements of an illegal search or seizure claim are different from those of involuntary servitude, which—according to the Plaintiffs—involves situations in which "the victim had no available choice but to work or be subject to legal sanction." *Id.* at 14 (cleaned up). In fact, the Plaintiffs' five new substantive claims appear to be "premised on a vast conspiracy theory to enslave random citizens." Murphy/Doyle Reply Br. at 4. *See also, e.g.*, Pls.' Resp. Br. at 6 ("Prior to encountering Plaintiffs, Defendants engaged in a conspiracy to violate the constitutional rights of Cook County citizens … ."); *id.* at 7 ("Given the testimony of the Plaintiffs that Officers Murphy, Mousel, and Mears, immediately raised the idea of trading guns for their freedom … a reasonable jury could find that officers had agreed to abuse their police authority to escalate pressure on citizens to work for the police."). This is not a situation where, for example, the Plaintiffs decided to add an illegal-seizure claim based on the Illinois equivalent of the Fourth Amendment, Ill. Const. art. I, § 6, so no new factual exploration would be needed. Instead, the Plaintiffs just declare *ipse dixit* that there is no prejudice—but offer no substantive analysis or explanation of the *elements* of the new claims and how they would fit the existing facts. So "it seems likely that [the Defendants] … would have

to engage in substantial additional discovery and thus be prejudiced ... ." *See Johnson v. Methodist Med. Ctr. of Ill.*, 10 F.3d 1300, 1304 (7th Cir. 1993); *see also* Murphy/Doyle Reply Br. at 4-5 ("If allowed, these claims would fundamentally change the case from a garden-variety false arrest/illegal search and seizure lawsuit to a broad scale conspiracy on par with a class action."). After years of discovery—not to mention massive opening summary judgment filings—"[t]here must be a point at which a plaintiff makes a commitment to the theory of its case." *Johnson*, 10 F.3d at 1304. Here, the time for amending the joint complaint to add substantive claims is long past.

## B. Smith's Illegal Seizure Claim

### 1. Traffic Stop and Arrest

Turning now to the properly asserted claims, the County Defendants argue that "Smith's allegation of illegal seizure is baseless" because "probable cause [existed] to both seize and arrest him." R. 253 at 8-9. Like an arrest, a traffic stop also constitutes a seizure under the Fourth Amendment "even though the purpose of the stop is limited and the resulting detention quite brief." *Brendlin v. California*, 551 U.S. 249, 255 (2007) (cleaned up). But in contrast to a full-blown arrest, there are instances when a traffic stop can be made based on reasonable suspicion (which is short of probable cause). *See, e.g.*, *United States v. Miranda-Sotolongo*, 827 F.3d 663, 666 (7th Cir. 2016) ("A traffic stop is reasonable when the officer has reasonable suspicion that criminal activity is afoot, which can extend to violations of traffic laws[.]" (cleaned up)). The difference is that the investigative steps taken during

traffic stops that are justified only on reasonable suspicion must be reasonably related to the grounds for suspicion in the first place. *See Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cty.*, 542 U.S. 177, 185 (2004). In contrast, a traffic stop based on probable cause allows an officer to arrest the driver, to search the driver incident to arrest, and to conduct a search incident to arrest of the vehicle if it is reasonable to believe that evidence relevant to the crime of arrest might be found inside. *See Arizona v. Gant*, 556 U.S. 332, 338-39, 343 (2009).

In any event, the existence of probable cause is an absolute bar to an illegal-seizure claim under the Fourth Amendment. *See Friedman v. Vill. of Skokie*, 763 F.2d 236, 239 (7th Cir. 1985); *see also* R. 253 at 9. But an officer's "subjective intentions play no role in [the] probable cause inquiry." *Valance v. Wisel*, 110 F.3d 1269, 1275 (7th Cir. 1997). And while it is true that the probable-cause analysis turns on the information known to the officer at the time of the seizure, *see Gower v. Vercler*, 377 F.3d 661, 668 (7th Cir. 2004), that inquiry is then *objective*, meaning the question is whether a reasonable officer had probable cause to make the arrest. Here, it is undisputed that Smith was arrested after he told officers that he did not have a valid driver's license, Pls.' Resp. County DSOF ¶¶ 13-14. Because probable cause existed to arrest him, *all* of the Defendants are entitled to summary judgment as to Smith's *arrest*.

But there is still the issue of whether the *traffic stop* itself was reasonable in the first place. *See* Pls.' Resp. Br. at 7, 9-10 (arguing that the officers lacked probable cause for the traffic stop). The Plaintiffs contend that Smith "had been driving East

on 69th Street for no more than 10 minutes before he passed a mall area at 69th and Ashland when the individual defendants pulled him over. He had not made any turns before the traffic stop." PSOF ¶ 2. *See also* Pls.' Resp. Br. at 10 ("[Smith] could not have failed to signal when turning because he did not make a turn, and the officers lacked any basis to curb the vehicle."). In response, the Defendants point to Smith's testimony that he did have to make a right turn to get onto 69th Street in the first place. *See* County Defs.' Reply Br. at 2-3; R. 281, Mears/Lynwood Reply Br. at 9; R. 282, Murphy/Doyle Reply Br. at 12. But the evidence is not as clear-cut as either side says it is.

For one, Smith's testimony about making (or not making) a right turn onto 69th Street requires careful parsing. At Smith's deposition, defense counsel asked, "What was Jasmin doing at the moment you were pulled over?" Smith Dep. at 136:24-137:1. After Smith answered, defense counsel followed up, "Had you *just* made a turn onto 69th Street?", to which Smith answered, "No." *Id.* at 137:6-8 (emphasis added). Smith then explained that he had picked up a passenger somewhere between Western and Damen and had been traveling eastbound on 69th Street for "no more than ten minutes." *Id.* at 137:9-17. When defense counsel then asked him whether he had to turn onto 69th from wherever he was picking up the passenger, Smith said yes, adding that he turned right onto 69th. *Id.* at 137:21-138:3. Despite the Defendants' contention that "no more than ten minutes" could mean as little as one minute, Mears/Lynwood Reply Br. at 9, this testimony allows a reasonable jury to infer that Smith had *not* made a right turn *immediately* before getting pulled over,

and that he had been traveling eastbound on 69th for at least a little while. What's more, Smith also testified that the officers were not following him—instead, when he drove past them, they turned right from a mall area near 69th and Ashland and pulled him over on the right in between Justine and Ashland. *Id.* at 138:4-12. *See infra* Figure 1.[12]



---

[12]At the summary judgment stage, the Court takes judicial notice of Google Maps images for the general purpose of understanding the relative geographic locations referenced by the parties. *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1177 n.3 (7th Cir. 2013) ("We have taken judicial notice of—and drawn our distance estimates from—images available on Google Maps, a source whose accuracy cannot reasonably be questioned, at least for the purpose of determining general distances.").

In contrast, the County Defendants maintain that "Officer Murphy and Officer Mousel observed the vehicle occupied by Smith and McBride turn without properly signaling." County DSOF ¶ 10; Murphy Dep. 48:7-13, 83:24-84:3; Mousel Dep. at 91:8-12. Specifically, contrary to Smith's account, Murphy testified that he was driving westbound on 69th Street when he saw Smith driving northbound on Marshfield and then turn right to go eastbound on 69th, at which point Murphy made a U-turn to pull Smith over. Murphy Dep. at 83:12-84:11. Murphy's police report, which he drafted several days after the traffic stop, also says that he saw Smith making a right turn onto 69th from Marshfield. CCSPD Mem. at 5. On this record, there is a genuine dispute of material fact. Taking the evidence in the light most favorable to Smith, a reasonable jury could infer that for the officers to turn right from the mall area at 69th and Ashland and curb Smith's car (which was traveling eastbound), that mall area was necessarily located on the south side of 69th St. *See supra* Figure 1. This means that the mall area is *either* the area between Marshfield and Ashland, or the area between Ashland and Justine, on the south side of 69th. *See id.* A reasonable jury could further infer that if the officers were somewhere between Ashland and Justine, they could *not* have possibly seen Smith make a right turn onto 69th—from either Marshfield or another street further west. *See id.* Similarly, a reasonable jury could also infer that, even if the officers had been in the mall area between Ashland and *Marshfield*, they still could not have possibly seen Smith turn right onto 69th because there is enough evidence that Smith had not turned onto 69th from

Marshfield at all. *See id.*; *see also, e.g.*, Smith Dep. at 136:24-137:8 (Smith testifying that he had not *just* turned right onto 69th when he was pulled over).

Because there is a genuine dispute on whether the officers saw Smith make a turn at all, let alone a turn without properly signaling, a reasonable jury could find that there was no probable cause (or even reasonable suspicion) for the officers to believe that Smith had committed a traffic violation. On this basis, Smith's illegal-seizure claim survives as to Officers Mousel and Murphy—both of whom participated in the decision to pull Smith over—but limited to the brief period when Smith was pulled over and before he was arrested for lack of a valid driver's license. *See* County DSOF ¶ 10; Mousel Dep. at 92:14-22 (Mousel testifying that he pointed out Smith's alleged traffic violation). *See also Martin v. Marinez*, 934 F.3d 594, 605-606 (7th Cir. 2019) ("[T]he damages arising from Martin's incarceration are simply too attenuated from and unrelated to the Fourth Amendment violation he has proven: a brief detention unsupported by probable cause or reasonable suspicion. His damages award was thus properly limited to the harm arising from his unconstitutional detention before his lawful arrest.").

But there is no evidence that Dwyer, Gosling, and Mears had any personal involvement in the decision to pull Smith over. So those three officers are entitled to summary judgment on that aspect of Smith's illegal-seizure claim. *See Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003) ("[L]iability does not attach unless the individual defendant caused or participated in [the] constitutional deprivation." (cleaned up)). *See also, e.g.*, R. 259 at 6-7; Mears Dep. at 127:18-128:17 (Mears

testifying that he did not see Smith break any traffic laws, he only later found out why Smith was pulled over, and he could not recall what was said before the traffic stop because he was in the back seat and "probably on [his] phone[.]").

### a. Qualified Immunity – Traffic Stop

The next question is whether Murphy and Mousel are entitled to qualified immunity on Smith's illegal-seizure claim for the traffic stop. Qualified immunity protects government officials performing discretionary functions from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine if officials are entitled to qualified immunity, courts must evaluate (1) "whether the plaintiff has alleged a deprivation of a constitutional right," and (2) "whether the right at issue was clearly established at the time and under the circumstances presented." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). Courts are permitted "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first … ." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Although Smith does not identify a factually analogous case, there is no question that, at the time of the stop in July 2015, it was—and continues to be—well established that the Fourth Amendment does not authorize traffic stops absent reasonable suspicion or probable cause. *See, e.g.*, *United States v. McDonald*, 453 F.3d 958, 960 (7th Cir. 2006) ("Police can stop an automobile when they have probable cause to believe that the driver violated even a minor traffic law. … In addition, police

may conduct a brief, investigatory traffic stop if they have reasonable suspicion based on articulable facts that a crime is about to be or has been committed." (cleaned up)). *See also Eberhardt v. O'Malley*, 17 F.3d 1023, 1028 (7th Cir. 1994) ("This is such an elementary violation of the First Amendment that the absence of a reported case with similar facts demonstrates nothing more than widespread compliance with well-recognized constitutional principles."). Applied to the concrete facts of this case (at least the facts when viewed in Smith's favor), qualified immunity does not apply: a reasonably jury could find that the officers did not see any traffic violation whatsoever, and thus clearly had no basis to pull Smith over. So Murphy and Mousel are not entitled to qualified immunity on Smith's Fourth Amendment illegal-seizure claim.

## 2. Seizure in Mears' Police Car

One more aspect of Smith's illegal-seizure claim is at issue. The Plaintiffs argue that Smith was also seized when "Doyle and Mears forced him to go with them to pick up Ms. Hicks … ." Pls.' Resp. Br. at 19. According to the Plaintiffs, Smith was not free to refuse the officers' demands for guns, because doing so would have jeopardized McBride's safety. *Id.* at 20. Put another way, Smith is arguing that being forced to go with the officers to pick up Hicks and retrieve guns constituted an illegal seizure.[13] Of course, an arrest based on probable cause is generally lawful even if the initial traffic stop was unreasonable. *See Martin*, 934 F.3d at 605-606. But even "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner

---

[13]Although the stand-alone § 1983 conspiracy claim was dismissed, the Plaintiffs can still rely on a conspiracy theory of liability. *See* R. 145, 3/30/18 Opinion at 6, n.5.

of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). *See Sivard v. Pulaski Cty.*, 959 F.2d 662, 665 (7th Cir. 1992) ("[A] warrantless arrest does not support a claim under § 1983 if the arresting police had probable cause. That general rule, however, does not preclude *all* § 1983 actions for wrongful detentions that follow constitutional arrests."), *abrogated on other grounds by Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993).

A jury can reasonably conclude that Smith was indeed "seized" within the meaning of the Fourth Amendment when he went with Mears and Doyle to pick up Hicks. A seizure occurs "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave[.]" *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). This test requires analyzing the totality of the circumstances and asking "whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991). Here, Smith was arrested by Murphy at the traffic stop, handcuffed, and then transported to the Command Post in a police vehicle. *See* Defs.' Resp. PSOF ¶ 6; Mousel Dep. at 124:19-21; Smith Dep. at 290:16-24; Pls.' Resp. County DSOF ¶ 19; Murphy Dep. at 108:3-6, 125:15-18. Smith was also handcuffed in Mears' police car, Smith Dep. at 193:2-8, 307:10-12, and testified that the doors were locked so that a passenger could not open them from the inside, *id.* at 199:16-21. "[T]here can be little question that a suspect placed in handcuffs is not free to leave and, for all practical purposes, is in police custody." *Monroe v. Davis*, 712 F.3d

1106, 1115 (7th Cir. 2013) (cleaned up). *See also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (explaining that both drivers and passengers are seized "from the moment a car stopped by the police comes to a halt on the side of the road." (cleaned up)).

What's more, there is enough evidence to dispute the Defendants' contention that Smith voluntarily accompanied Mears and Doyle, *see, e.g.*, Murphy/Doyle DSOF ¶ 18; Mears/Lynwood DSOF ¶ 50. For one, McBride testified that the officers "were making [Smith] go with them … ." McBride Dep. at 187:7-24. And of course, Smith's alleged "agreement" to accompany the officers occurred only after Murphy had already threatened Smith at the traffic stop, telling Smith that if he loved McBride and wanted to get her out of "this situation," he would need to produce three handguns. *See* PSOF ¶ 9. In fact, Smith testified that two officers at the Command Post repeated Murphy's threat. Smith Dep. at 164:1-166:18. Combined with the handcuffs, this level of coercion readily raises a jury question on whether Smith had been seized to further the gun plot. *Cf. United States v. Strache*, 202 F.3d 980, 986 (7th Cir. 2000) (police custody is not dispositive of the issue of voluntary consent "so long as the potentially coercive effect of custody was mitigated by the circumstances."). In sum, these facts raise the inference that a reasonable person in Smith's position—handcuffed, stuck in a locked police car, and coerced to help retrieve illegal firearms in the middle of the night—would not have believed he was "free to leave."

A reasonable jury can also infer that Smith's seizure in Mears' police car was unreasonable under the Fourth Amendment because it exceeded the "mission" of

arresting Smith for driving without a valid license. "[T]he 'Fourth Amendment []
balances the nature and quality of the intrusion on personal security against the
importance of the governmental interests alleged to justify the intrusion[.]'" *United
States v. Cherry*, 920 F.3d 1126, 1134 (7th Cir. 2019) (quoting *United States v.
Hensley*, 469 U.S. 221, 228 (1985)). Although the existence of probable cause is an
objective determination, *Devenpeck v. Alford*, 543 U.S. 146, 152-54 (2004), "the
reasonableness of a seizure … depends on what the police in fact do[,]"*Rodriguez v.
United States*, 575 U.S. 348, 357 (2015). Specifically, "[a]uthority for [a] seizure …
ends when tasks tied to the traffic infraction are—or reasonably should have been—
completed." *Id.* at 349. For example, "[a] seizure that is justified solely by the interest
in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond
the time reasonably required to complete that mission." *Caballes*, 543 U.S. at 407.
Essentially, a lawful seizure based on probable cause does not violate the Fourth
Amendment unless the officers' conduct infringes on a constitutionally protected
interest, thus changing the lawful character of the seizure. *See id.* at 407-409 (holding
that an otherwise-lawful seizure did not violate the Fourth Amendment by virtue of
a narcotics dog sniff because there is no legitimate, constitutional interest in
possessing contraband).

Here, the Defendants concede that the "plan" for the ride with Mears and Doyle
was for Hicks to obtain guns from Pudge based on information relayed by McBride.
*See, e.g.*, Murphy/Doyle DSOF ¶¶ 7-9; Mears/Lynwood DSOF ¶¶ 38, 49; County DSOF
¶¶ 28, 36, 38; R. 261 at 6. There is no evidence that Smith was offered leniency for

his *own* arrest if he went with Mears and Doyle (or obtained firearms), nor is there evidence that the plan was at all related to him driving without a license. In fact, Smith was not even processed for booking when he was taken to the Command Post, nor was an arrest report ever created for him. *See* Pls.' Resp. Br. at 5, 8, 10; Murphy Dep. at 76:9-11. *See also* Sullivan Dep. at 14:3-15:1, 33:15-34:7 (testifying that every arrestee, even if released without charges, must get an arrest report and be documented in the I-CLEAR system). Although probable cause existed to support the initial arrest, the record permits a reasonable jury to conclude that forcing Smith to help Mears and Doyle unreasonably exceeded the purpose of the arrest, transforming its lawful character into an unreasonable seizure. *See Dunaway v. New York*, 442 U.S. 200, 214-15 (1979) ("[T]he Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry … ." (cleaned up)).[14]

But the only Defendants who could be held liable for Smith's seizure during the ride with Mears and Doyle are those who *knew* that the ride exceeded the scope of the initial arrest. In other words, to hold anyone liable for his seizure in Mears'

---

[14]There is also evidence that officers removed Smith's handcuffs at some point after he arrived at the Command Center, but then handcuffed him again before the ride with Mears and Doyle. *Compare* Smith Dep. at 290:16-24 (testifying that he was handcuffed to the back when taken to the Command Center), *with id.* at 193:2-8, 307:10-12 (testifying that he was handcuffed *to the front* on the way to Hicks' house). Although Smith also testified that an unnamed officer did not remove the handcuffs "at any point," the question referenced a single officer in the specific context of Smith being pulled out of the police vehicle at the Command Center—in other words, Smith's testimony does not preclude the handcuffs being removed at another point or by another officer. *See id.* at 164:21-23. These facts—especially considering that officers later gave Smith his keys back and allowed him to drive away without a valid license, Defs.' Resp. PSOF ¶ 26—raise the inference that when Smith was seized during the ride with Mears and Doyle, the officers had already decided not to charge him for driving without a license.

police car, Smith must show that (1) the particular Defendant knew McBride was being set-up; and (2) the Defendant personally participated in or caused Smith's seizure. Starting with the latter, the personal-involvement requirement of § 1983 is satisfied as to Mears because he was the one who drove Smith to pick up Hicks and retrieve the firearms. There is also enough circumstantial evidence that Murphy orchestrated the plan to set-up McBride and extort illegal firearms for a jury to infer that Murphy caused or was involved in the decision to force Smith to help Mears and Doyle. *See, e.g.*, Smith Dep. at 153:3-15 (testifying that Murphy told him to obtain three guns if he wanted to get himself, McBride, and the car out of the "situation"). *See also Rasche*, 336 F.3d at 597.

Moving to the issue of the Defendants' knowledge, Murphy and Mears are the only defendants who could be inferred to have known about the plan to frame McBride. McBride testified that Murphy "never mentioned anything about any narcotics[,]"and that she did not have any crack cocaine in her possession that night. PSOF ¶ 5; McBride Dep. at 364:22-365-6. But Mears testified that during the traffic stop, after searching McBride, Murphy came up to him and "dangled" the bag of cocaine by the knotted end, telling Mears, "'[s]he had rock on her.'" Mears Dep. at 145:4-146:12. Considering Mears' testimony that he was standing with Smith by the police car after Smith was arrested, Mears Dep. at 141:11-14, a jury could reasonably infer that Smith was in a position to see Murphy "dangling" the bag. Yet Smith testified that he did *not* see a knotted plastic bag at the traffic stop. Smith Dep. at 320:22-321:2. This testimony creates a triable issue on whether Mears lied about

seeing the bag of cocaine, whether Murphy actually found any narcotics (or what appeared to be narcotics) on McBride's person, and ultimately, whether Mears and Murphy were both in on the conspiracy. *See Thornton v. Evans*, 692 F.2d 1064, 1075 (7th Cir. 1982) ("[W]e are always hesitant to grant summary judgment when subjective matters"—such as a party's knowledge—"are material to the case.").

In contrast, there is no record evidence that Dwyer, Gosling, Doyle, or Mousel were aware of a plan to falsely arrest McBride and demand guns in exchange for her release, so those officers were entitled to rely on Murphy's statements that he arrested her for cocaine possession. *See, e.g.*, *Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 680 (7th Cir. 2007) ("Fellow law enforcement personnel are among the witnesses whose accounts the arresting officer may rely upon."); *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001) ("Whether or not the officers were given faulty … information concerning the present status of Mounts' Illinois driver's license is immaterial to the case because police officers are entitled to rely on the reasonable information relayed to them from a police dispatcher."). There is also no evidence that Dwyer, Gosling, or Mousel participated in or caused the decision to take Smith along. As for Doyle, although he was in the police car with Smith and was certainly involved, there is nothing to suggest that he knew the seizure was unrelated to Smith's arrest for driving without a license or was otherwise unlawful.

### a. Qualified Immunity – Seizure in Mears' Police Vehicle

The next question is whether Mears and Murphy are entitled to qualified immunity for illegally seizing Smith during the ride with Mears and Doyle to pick up

Hicks. The answer is no. For one, it is clearly established that even arrests supported by probable cause can violate the Fourth Amendment if they are unreasonably executed or if they are followed by wrongful detentions that infringe on constitutionally protected interests. *See, e.g.*, *Caballes*, 543 U.S. at 407; *Sivard*, 959 F.2d at 665. It is similarly well established, as discussed above, that "[a]uthority for [a] seizure … ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 349. Of course, the qualified-immunity inquiry is not applied at this high-level of generality; the question is whether a reasonable officer would know that the specific misconduct in the specific factual circumstances was unconstitutional. Considering Smith's unusual allegations, however, it is not surprising that there does not appear to be any case that presents the exact same set of facts. *See Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1022 (7th Cir. 2000) ("[A] plaintiff need not always identify a closely analogous case; rather he can establish a clearly established constitutional right by showing that the violation was so obvious that a reasonable person would have known of the unconstitutionality of the conduct … ."). But no reasonable officer could believe that the Fourth Amendment allows forcing an arrestee to help retrieve illegal guns by threatening to imprison his girlfriend on false charges, even if the seizure to do so *was* after a valid arrest for driving without a license. In fact, under these circumstances, only a plainly incompetent officer could believe that forcing Smith to help Mears and Doyle by invoking a frame-up of McBride promoted a legitimate governmental interest that justified the significant intrusion on Smith's privacy and

personal security. *See Wyoming v. Houghton*, 526 U.S. 295, 299-300 (1999) (explaining that the "traditional standards of reasonableness" require "assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").

Mears argues that he reasonably relied on Murphy's statements that probable cause existed to stop Smith's vehicle and arrest Smith. *See* R. 259 at 9. But as previously discussed, although Mears is correct with regard to the traffic stop and the initial arrest, the record—at least on summary judgment—supports the inference that Mears *knew* there was no crack cocaine and, in turn, that there was no lawful basis to coerce Smith into helping retrieve the firearms. Considering Mears' personal knowledge of McBride's set-up, his alleged reliance on Murphy's statements could not have been objectively reasonable. For these reasons, Mears and Murphy are not entitled to qualified immunity on this portion of Smith's illegal seizure claim.

## C. McBride's Search and Seizure Claims

Turning now to McBride's claims, the Defendants argue that Gosling, Mears, and Doyle had no personal involvement in McBride's alleged search or seizure, or at the very least, that Gosling, Mears, Mousel, and Dwyer are shielded by qualified immunity because they did not violate clearly established law. *See* R. 253 at 9-13; R. 259 at 10-13; R. 261 at 3.

Starting with Doyle, the Plaintiffs do not offer any evidence to suggest that he personally participated in or caused the search and seizure of McBride. Instead, the Plaintiffs' only argument is that he "played [a] material role[] in furthering the conspiracy by seizing Ms. Hicks to acquire firearms" and forcing Smith to go with him and Mears to pick her up. *See* Pls.' Resp. Br. at 8, 19. But that says nothing about McBride's claims against Doyle. So Doyle is entitled to summary judgment on both of McBride's claims. *See Rasche*, 336 F.3d at 597. The same goes for Mears. Again, the Plaintiffs' arguments on Mears are largely limited to Smith's and Hicks' claims. *See generally* Pls.' Resp. Br. Although there is evidence suggesting that Mears was at the traffic stop and knew McBride was being framed, *see, e.g.*, Mears Dep. at 141:11-14, 145:4-146:12, that alone is not enough to raise the inference that Mears *caused* or personally participated in her unlawful search and seizure. Likewise, there is nothing to suggest that Mousel was personally involved in arresting or searching McBride. Even though the record raises a reasonable inference that Mousel (and Murphy) never actually saw Smith turn without a signal—which would make the traffic stop itself unlawful—the Plaintiffs failed to argue that *McBride* was unlawfully seized as a passenger by virtue of the initial traffic stop, so that argument is forfeited. *See Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) ("[A] party forfeits any argument it fails to raise in a brief opposing summary judgment." (cleaned up)).

The record is also devoid of any evidence that Gosling and Dwyer were personally involved in or somehow caused the search of McBride, so they too are entitled to summary judgment on that particular claim. *See id.* But the Plaintiffs do

argue that Gosling played a material role in the conspiracy by transporting McBride to lockup and, later, to the alley where the handguns were placed, *see* Pls.' Resp. Br. at 8, so Gosling *did* personally participate in McBride's seizure. The Plaintiffs also contend that Dwyer "orchestrated the plot," pointing to evidence that he approved the plan to obtain the guns and spoke to McBride about it. *See* Pls.' Resp. Br. at 8; PSOF ¶¶ 11-12. In addition, there is evidence that Dwyer was at the traffic stop, *see* Pls.' Resp. County DSOF ¶ 9, that he ordered Murphy to take McBride to lockup, *id.* ¶ 34, and that he later approved McBride's release, *id.* ¶ 71. But despite this, the County Defendants are correct that both Gosling and Dwyer are entitled to qualified immunity. The crucial question in the qualified immunity analysis is whether a reasonable officer would know that the officers were violating clearly established law. *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014). The County Defendants emphasize that Gosling and Dwyer's actions were reasonable given the information known to them. R. 253 at 4, 13. Specifically, they argue that there is no evidence that Dwyer "had any reason to doubt that McBride was found with drugs on her[,]" *id.* at 13, nor that "Gosling[] engaged in any conduct that [he] should have known was unlawful[,]" County Defs.' Reply Br. at 5. Indeed, the Plaintiffs fail to point to any evidence that either Gosling or Dwyer had reason to distrust Murphy, or knew that Murphy's statements were false and that McBride did not actually have drugs. Ultimately, Gosling and Dwyer cannot be liable for McBride's seizure where they reasonably relied on Murphy's statements. *See, e.g., Holmes*, 511 F.3d at 680 ("Fellow law enforcement personnel are among the witnesses whose accounts the arresting officer

may rely upon."); *Duran v. Sirgedas*, 240 Fed. App'x 104, 115 (7th Cir. 2007) ("[W]here a police officer makes an arrest on the basis of oral statements by fellow officers, an officer will be entitled to qualified immunity … provided it was objectively reasonable for him to believe, on the basis of the statements, that probable cause for the arrest existed." (cleaned up)) (non-precedential disposition).

The Plaintiffs, however, insist that qualified immunity should not apply because "extortion has always been unlawful." Pls.' Resp. Br. at 20. Well, yes. But without knowing that McBride was being (or would be) framed, Gosling and Dwyer had no way of knowing that transporting her to lockup and taking her to the alley was an act of extortion. In other words, even taking the evidence in the light most favorable to McBride, a reasonable officer in Gosling's and Dwyer's position could not have known that McBride's arrest was not supported by probable cause and that their participation in her seizure violated her Fourth Amendment rights. *See Harlow*, 457 U.S. at 818. *Cf. BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) ("The continuation of even a lawful arrest violates the Fourth Amendment when the police *discover additional facts* dissipating their earlier probable cause." (emphasis added)).

For the all the reasons discussed, Gosling, Mears, Doyle, Dwyer, and Mousel are all entitled to summary judgment on McBride's search and seizure claims.

### D. Hicks' Search and Seizure Claims

Next up are Hicks' claims. First, the Defendants argue that Hicks was never searched, not even when Doyle allegedly told her to look through her phone, asked her questions about various contacts, and instructed her to call Pudge. *See, e.g.*, R.

253 at 18-20; R. 259 at 16-17; R. 261 at 5-6. Not only do the Plaintiffs fail to respond to the Defendants' arguments, the Plaintiffs also fail to present *any* argument in support of Hicks' illegal-search claim. In fact, when the Plaintiffs *do* discuss Hicks' phone, they do not even allege that it was searched, only that its confiscation was a sign of a "classic seizure." Pls.' Resp. Br. at 19. Hicks has forfeited her illegal-search claim.

Moving on to Hicks' illegal-*seizure* claim, however, a jury can reasonably conclude that she was unlawfully seized. "The 'crucial' test for determining if there has been a seizure is 'whether taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015) (quoting *Bostick*, 501 U.S. at 434). "Circumstances that suggest a seizure include the threatening presence of several officers, display of their weapons, physical touching of the private citizen, use of forceful language or tone of voice (indicating that compliance with the officers' request might be compelled), and the location in which the encounter takes place[,]" as well as "whether the citizen's freedom of movement was intruded upon in some way … and whether the officers informed the suspect that he or she was free to leave." *Id.* (cleaned up). These factors are "neither exhaustive nor exclusive." *Id.*

Of course, the Defendants deny that Hicks was ever seized, maintaining that she voluntarily accompanied the officers in order to help her daughter. *See, e.g.*, R.

253 at 13-15; R. 259 at 13-17; R. 261 at 3-6. It is true that "officers do not violate the Fourth Amendment by approaching an individual in a public place and asking the individual if he is willing to cooperate with an ongoing criminal investigation." *United States v. Scheets*, 188 F.3d 829, 837 (7th Cir. 1999). It is also true that a person is not "seized" when their encounter with police is consensual and voluntary—that is, when the encounter "involves no restraint on the citizen's liberty, and … is characterized by an officer seeking the citizen's voluntary cooperation … ." *United States v. Maldonado*, 38 F.3d 936, 939 (7th Cir. 1994). But when the record is viewed in Hicks' favor, there was no voluntary consent here. Instead, the facts permit a reasonable jury to conclude that (1) Hicks' so-called compliance was coerced; and that (2) a reasonable person in Hicks' position would not have believed they were free to leave the police car, nor that they could go about their business and disregard officers who showed up in the middle of the night threatening to frame their daughter. *See Mendenhall*, 446 U.S. at 554; *Bostick*, 501 U.S. at 434-36.

For one, Hicks testified that when McBride called her, Hicks could hear the police telling McBride what to say. PSOF ¶ 14; Hicks Dep. No. 1 at 84:8-17. Likewise, McBride testified that she relayed messages between the officers and her mother. PSOF ¶ 14; McBride Dep. at 197:5-15. During one of those conversations, an officer apparently told Hicks—through McBride—that if she was not sure she could get the guns the next day, they were "going to have to lock Jasmin up." McBride Dep. at 199:4-13. McBride also told Hicks that the police "was *going to give [McBride] a case,* if [she] didn't get any guns, because [she was] on probation." Hicks Dep. No. 1 at 80:1-

12 (emphasis added); Mears/Lynwood DSOF ¶ 42. In a recorded phone call, McBride can also be heard telling Hicks that the officers are on their way to pick her up. PSOF ¶ 15; Exh. K (Audio Recording). The Defendants contend that Hicks never told McBride or the officers that she did not want to go to retrieve the guns. *See, e.g.*, County DSOF ¶ 32; Hicks Dep. No. 2 at 33:11-17. But McBride testified that when her mom protested that "it was real late, and she's scared to go out[,]" the police said they were going to come get her anyway. PSOF ¶ 15; McBride Dep. at 182:2-4. In fact, McBride "never heard [Hicks] agree to it, but they demanded to come and get her … ." McBride Dep. at 182:3-6. And importantly, no officer ever told McBride or Hicks *what* McBride would be locked up for if she did not get the guns. *See id.* at 199:14-22; Hicks Dep. No. 1 at 83:3-9. These facts (if believed by the jury) show that (1) the officers did communicate with Hicks, and (2) if Hicks never knew there was a drug charge, then she was never asked and could not have known that she was being asked to voluntarily cooperate in a legitimate criminal investigation. *Cf. Scheets*, 188 F.3d at 837. So the totality of the circumstances, taken in the light most favorable to Hicks, raises the inference that a reasonable person in her position would have felt coerced into going with the officers. *See Maldonado*, 38 F.3d at 939.

But there is more, because what happened after the officers arrived to pick up Hicks also supports the inference that she was seized. Hicks knew Mears and Doyle were police officers because they had on "cop's clothes," which she described as "certain color uniforms" and "vested." Hicks Dep. No. 2 at 16:14-17:1. And when Hicks got in the car, she not only saw Smith handcuffed in the backseat, but she was also

told by one of the officers that her daughter would be charged with a crime and "gone for a long time" if Hicks failed to produce the guns. *See* Hicks Dep. No. 1 at 226:2-7, 226:13-16. Ultimately, Hicks was confronted—at a very late hour—with two uniformed officers who showed up at her home and were expecting her to comply with their demand for guns; with the sight of her daughter's boyfriend handcuffed in the backseat of the police car; and with the threat of her daughter being "given a case" and getting locked up for a "long time" if Hicks did not help the officers. A jury could easily infer that a reasonable person in Hicks' position would not have felt free to ignore the officers and go back home. *Cf. Mendenhall*, 446 U.S. at 555 (there was no seizure where the "events took place in a public concourse[,]" "[t]he agents wore no uniforms and displayed no weapons[,]" and the agents "did not summon the respondent to their presence.") What's more, a jury could also conclude that when Hicks lied and claimed not to know where to get the guns, Hicks Dep. No. 2 at 21:5-15; Pl.'s Resp. to Mears/Lynwood DSOF ¶ 57, the officers *must* have known then that her "cooperation" was not voluntary (considering they only went to pick her up because she *did* know the location of some illegal firearms, *see, e.g.*, Mears/Lynwood DSOF ¶ 51; Murphy/Doyle DSOF ¶ 19). In fact, when the officers took Hicks to the address that Pudge had provided, Hicks again expressed unwillingness to cooperate, telling them she was scared to get out of the car, Hicks Dep. No. 1 at 220:3-10. Yet at no point did the officers tell her she was free to leave. *See Smith*, 794 F.3d at 684. Nor is there any evidence that the officers tried to secure her voluntary cooperation by, for example, informing her that McBride was validly arrested for drug possession—

not even when they heard her tell Pudge that police were going to "give [McBride] a case[,]" Hicks Dep. No. 1 at 219:3-10.

Instead, despite Hicks' apparent unwillingness, the officers physically removed her to another location, taking her in the police car to the house on Indiana Street— another sign of a seizure. *See, e.g.*, *United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008) ("[W]hether the encounter took place in a public place or whether police removed the person to another location" is relevant when determining the existence of a seizure). And although Hicks does not remember the officers physically touching her phone, Mears/Lynwood DSOF ¶ 59; Hicks Dep. No. 2 at 42:5-10, there is evidence that the officers ultimately took her phone and placed it on the car's console, PSOF ¶ 20; Doyle Dep. at 104:13-25. So Hicks could not call anyone for help. And when Hicks came back to the police car *without* the promised guns, one of the officers was "very upset," telling Smith and Hicks that "[y]'all wasted our fucking time."[15] Smith Dep. at 211:1-20. While the profanity and phone confiscation would have taken place *after* Hicks was already seized, a jury can reasonably rely on them as circumstantial evidence of a coercive environment. *See Smith*, 794 F.3d at 684; *see also United States v. Black*, 675 F.2d 129, 136 (7th Cir. 1982) (retention of driver's license and airline ticket "beyond the interval required for … appropriate brief scrutiny, may constitute a 'watershed point' in the seizure question.").

---

[15]The Defendants dispute this, maintaining that the officers "did not make threats to Hicks, did not raise their voices at Hicks and were not rude to Hicks." *See, e.g.*, County DSOF ¶ 45; Hicks Dep. No. 2 at 33:18-34:4, 46:15-20, 47:23-48:9. But at this stage, the evidence must be viewed in Hicks' favor.

So when all this evidence is viewed in Hicks' favor, it is enough to raise the inference that Hicks was subjected to a seizure when she was coerced to go with Mears and Doyle. *Cf. Scheets*, 188 F.3d at 836-37 (holding that defendant was not seized where he agreed to accompany agents to office, there was no evidence that his consent was coerced, and the agents informed him that he was free to leave). And because there is no evidence that the officers had either reasonable suspicion or probable cause that Hicks herself had committed a crime (nor do the Defendants say they did), a reasonable jury could further conclude that Hicks' seizure was unlawful. *See, e.g.*, *id.* at 837 (lawful investigatory stop requires the officer to "have a particularized and objective basis for suspecting the particular person stopped of criminal activity." (cleaned up)).

### 1. Liability and Qualified Immunity – Unlawful Seizure

Again, although Hicks *was* unlawfully seized, whether any of the officers are liable depends on two questions: (1) whether the officer personally participated in or caused her seizure; (2) whether the officer knew that McBride was being framed; and (3) whether the officer is entitled to qualified immunity. Based on these requirements, Hicks' unlawful-seizure claim can only survive against Mears and Murphy (contrary to her apparent argument that *all* the Defendants are liable, *see* Pls.' Resp. Br. at 18-19). As previously discussed, a jury may reasonably infer that Murphy and Mears—but only Murphy and Mears—knew that McBride was being framed, meaning they were aware of the coercion Hicks was facing. In other words, because Hicks' seizure hinges on the fact that she was coerced through threats that her daughter would be

locked up on a false charge, an officer who did not know McBride was being framed was less likely to know that Hicks was not voluntarily cooperating (and so, could not have known that the ride to pick up the guns was a seizure).

Moving to the second requirement, Mears of course personally participated in Hicks' seizure because he picked her up and drove her to the house on Indiana Street. *See Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 614 (7th Cir. 2002) ("It is well-established that a plaintiff only may bring a § 1983 claim against those individuals personally responsible for the constitutional deprivation."). Likewise, even though Murphy was not physically present in the car, and even though the order to pick up Hicks ultimately came from Dwyer, the record suggests that Murphy was instrumental to the plan of picking Hicks up and using her to obtain the guns.[16] *See, e.g.*, PSOF ¶ 17; Mears Dep. at 210:9-12 (testifying that Murphy told him McBride's mom knows where the firearms are); *id.* at 211:14-16 (testifying that Murphy reiterated to him "exactly … where [Mears] was going to … pick up mom at"); CCSPD Mem. at 2 (Doyle police memo stating that he and Mears "provided assistance" to Murphy by meeting Hicks, and stating that after dropping her off, they went back to Command Post to brief Murphy). *See also, e.g., Jones v. City of Chicago*, 856 F.2d 985,

---

[16]In contrast, absent evidence that he knew about the set-up and resultant coercion, Doyle's various statements about McBride being charged and locked up can reasonably be attributed to his belief that Hicks was voluntarily cooperating on her daughter's drug arrest. *See Holmes*, 511 F.3d at 680; *Duran*, 240 Fed. App'x at 115. And in light of Hicks' overall compliance, her hesitation and the late hour are not sufficient indicators on their own that her actions were involuntary. *See Valance*, 110 F.3d at 1280-81 (affirming district court's determination that "even if a jury would be justified in finding that the consents were the product of police coercion, an objectively reasonable police officer in the [same] position … could have believed that his actions were lawful."). So Doyle cannot be held liable for Hicks' seizure, even though he personally participated in it.

994 (7th Cir. 1988) ("If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates ... They cannot hide behind the officials whom they have defrauded.").

Lastly, Mears and Murphy are not entitled to qualified immunity on Hicks' unlawful-seizure claim because they violated clearly established law (if the jury believes the Plaintiffs' version of the facts). *See Plumhoff*, 572 U.S. at 778-79. To repeat, the doctrine of qualified immunity shields police officers from liability if "a reasonable officer could have believed [their conduct] to be lawful, in light of clearly established law and the information the ... officer[] possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). And, again, given the unique circumstances of this case, the Plaintiffs cannot be expected to find a factually analogous case—nor do they need one in light of the outright extortion that they alleged applied to Hicks. *See Brokaw*, 235 F.3d at 1022 ("[I]n the most extreme cases, an analogous case might never arise because the existence of the right was so clear … that no one thought it worthwhile to litigate the issue." (cleaned up)). But the Plaintiffs have shown—at least at this stage of the litigation—that Mears' and Murphy's conduct was "so egregious that no reasonable person could have believed that it did not violate clearly established rights." *Wheeler*, 539 F.3d at 639 (cleaned up). There is no question that at the time of the Defendants' conduct, it was clearly established that (1) a police encounter in which a reasonable person would not believe they are free to leave is a seizure, *see, e.g., Mendenhall*, 446 U.S. at 554; (2) a lawful seizure must be supported

by probable cause or, at minimum, reasonable suspicion that the person seized committed or was about to commit a crime, *see, e.g.*, *McDonald*, 453 F.3d at 960; and (3) if the individual's encounter with the police was consensual and voluntary, then no seizure occurred, *see, e.g.*, *Maldonado*, 38 F.3d at 939. Here, if the facts are as the Plaintiffs describe them, neither Mears nor Murphy are entitled to qualified immunity. Put another way, a reasonable officer in their position could not have believed his conduct was lawful where he knew that Hicks' compliance was nonconsensual and involuntary (based on a frame-up of her daughter); where he never thought Hicks herself had committed or was about to commit a crime; and where he acted in such a way as to communicate to any reasonable person that they were not free to leave or ignore the police presence.

In sum, Hicks' unlawful seizure claim survives as to Mears and Murphy, but the other individual Defendants are entitled to summary judgment.

### E. Hicks—Intentional Infliction of Emotional Distress

Hicks also brought a state-law claim for intentional infliction of emotional distress, Joint Am. Compl. ¶¶ 113-17, which requires showing that "(1) the defendant's conduct was extreme and outrageous, (2) the defendant either intended that his conduct would inflict severe emotional distress, or knew there was a high probability that [it] would …, and (3) the defendant's conduct in fact caused severe emotional distress." *Zoretic v. Darge*, 832 F.3d 639, 645 (7th Cir. 2016) (cleaned up); *see Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80-81 (Ill. 2003). The Defendants argue that they are entitled to summary judgment because their conduct was not "extreme and

outrageous." *See, e.g.*, R. 253 at 21-22; R. 259 at 22-24; R. 261 at 10-11. Mears also argues that Section 2-202 of the Illinois Tort Immunity Act immunizes him from the emotional-distress claim because his alleged conduct was not "willful and wanton." R. 259 at 22-24. But Hicks' *only* argument in response is that the Defendants' efforts to dismiss this claim "on the ground that their conduct was not extreme and outrageous is incompatible with the facts … and … can only be supported if one forgets the lack of dignity and inhumanity in the way Defendants treated the Plaintiffs." Pls.' Resp. Br. at 24-25. Although the Court empathizes with Hicks, her failure to respond to the Defendants' arguments in any meaningful way means that the emotional-distress claim is forfeited.

## F. Failure to Intervene

Likewise, the Defendants are entitled to summary judgment on Smith's, McBride's, and Hicks' claims for failure to intervene. "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know … that any constitutional violation has been committed [or is about to be committed] by a law enforcement official; *and* the officer had a realistic opportunity to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). But the Plaintiffs' argument in support of these claims, tacked on to the end of their response brief, consists solely of the following sentence: "[T]he argument that Defendants had no opportunity to intervene and all other argument related to the absence of a constitutional violation fail as alleged in this brief." Pls.' Resp. Br. at 25.

This fails to address even the basic elements of a failure-to-intervene claim, and so these claims are waived too. *See Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) (claims are waived where the plaintiffs "did not provide the district court with any basis to decide their claims, and did not respond to the [defendant's] arguments[.]").

## IV. Conclusion

For the reasons discussed, the following claims survive: (1) Smith's illegal-seizure claim against Murphy and Mousel for the initial traffic stop; (2) Smith's illegal-seizure claim against Murphy and Mears for the seizure in Mears' police vehicle; (3) Hicks' illegal-seizure claim against Murphy and Mears for *her* seizure in Mears' police vehicle; (4) all of McBride's claims against Murphy (who did not move for summary judgment against her); and (5) the Plaintiffs' indemnification claim against the Village of Lynwood and the Cook County Sheriff's Office. The Defendants are otherwise entitled to summary judgment on the rest of the Plaintiffs' claims.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: March 19, 2020